DEPOSITION OF WILLIAM MARTIN                                                    MARCH 12TH, 2008

PAGE 1  SHEET 1

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 3                    SOUTHERN DIVISION
 4
 5   KASEY D. ALVES,
 6            Plaintiff,
 7   VS.              CAUSE NO.: 1:06cv912 LG-JMR
 8   HARRISON COUNTY MISSISSIPPI, BY AND
     THROUGH THE BOARD OF SUPERVISORS;
 9   HARRISON COUNTY SHERIFF'S DEPARTMENT;
     SHERIFF GEORGE PAYNE, JR.; AND,
10   HEALTH ASSURANCE, LLC.,
11            Defendants.
12
13                    DEPOSITION
14                        OF
15                  WILLIAM MARTIN
16         Taken on behalf of the Plaintiff
17      1:41 p.m., Wednesday, March 12th, 2008
18                      before
19              Lisa H. Brown, CSR #1166
20
21
22
23               COAST-WIDE REPORTERS
                    Court Reporters
24                Post Office Box 95
              Biloxi, Mississippi  39533-0095
25                  (228) 374-5066
```

PAGE 2

```
                                                    2
 1          The deposition of WILLIAM MARTIN, taken on
 2   the 12th day of March, 2008, commencing at 1:41 p.m.,
 3   at the offices of the Harrison County Board of
 4   Supervisors, 1831 23rd Avenue, in the City of
 5   Gulfport, County of Harrison, State of Mississippi,
 6   before Lisa Hood Brown, CSR, Freelance Court Reporter
 7   and Notary Public within and for the County of
 8   Harrison, State of Mississippi.
 9
10   APPEARANCES:
11        WOODROW W. PRINGLE, III, ESQUIRE
          2217 Pass Road
12        Gulfport, Mississippi  39501
          Appearing on behalf of the Plaintiff.
13
          JON S. TINER, ESQUIRE
14        Dukes, Dukes, Keating & Faneca
          2909 - 13th Street, Sixth Floor
15        Gulfport, Mississippi  39501
          Appearing on behalf of the Defendant,
16          Sheriff George Payne, Jr.
17        JOSEPH MEADOWS, ESQUIRE
          KAREN J. YOUNG, ESQUIRE
18        Meadows Law Firm
          Post Office Drawer 1076
19        Gulfport, Mississippi  39502
          Appearing on behalf of the Defendant,
20          Harrison County Board of Supervisors.
21        ROBERT H. PEDERSEN, ESQUIRE
          Watkins & Eager
22        400 East Capitol Street
          Jackson, Mississippi  39205
23        Appearing on behalf of the Defendant, Heath
            Assurance, LLC.
24
25   ALSO PRESENT:  Connie Rocko
```

PAGE 3

```
                                                    3
 1                  I N D E X
 2   WILLIAM MARTIN:                           PAGE:
 3        EXAMINATION
 4             By Mr. Pringle --------------- 4
 5             By Ms. Young ----------------- 34
 6             By Mr. Pringle --------------- 37
 7                      - - -
 8                  E X H I B I T S
 9        No. 5 ----------------------- 36
10                      - - -
11        REPORTER'S CERTIFICATE ------- 39
12                      - - -
13        ERRATA SHEET ---------------- 40
14                      - - -
```

PAGE 4

```
                                                    4
 1                   WILLIAM MARTIN,
 2   Having been produced and first duly sworn, was
 3   examined and testified as follows:
 4                      - - -
 5                   EXAMINATION
 6   BY MR. PRINGLE:
 7        Q.   Please state your name.
 8        A.   William Martin.
 9        Q.   Mr. Martin, you're currently a member of the
10   Board of Supervisors --
11        A.   Yes.
12        Q.   -- for Harrison County?
13        A.   Yes.
14        Q.   You're currently the president of the Board?
15        A.   Yes.
16        Q.   What years have you been serving on the
17   Board?
18        A.   Since 1999, through the present.
19        Q.   You're also a licensed practicing attorney?
20        A.   Yes.
21        Q.   And, at one time, you were an Assistant
22   District Attorney?
23        A.   Correct.
24        Q.   What years were you Assistant District
     Attorney?
```

EXHIBIT A

PAGE 5 SHEET 2

5

1     A.   1987, and 1989 through 19- -- April of 1996.
2     Q.   As a member of the Board of Supervisors, what
3 role does the Board have in the management of the
4 Harrison County Detention Center?
5     A.   Appropriations.
6     Q.   Any others?
7     A.   No.
8     Q.   Let me show you Exhibit 1. It's a Consent
9 Judgment, January 12, 1995, from the U.S. District
10 Court. Have you seen this before?
11     A.   Yes.
12     Q.   Have you had an opportunity to review it and
13 read it before?
14     A.   Before, I have. I haven't read it recently.
15     Q.   Yeah, okay. And you're aware that one of the
16 Defendants in this case was Harrison County,
17 Mississippi?
18     A.   Yes.
19     Q.   And you're aware that basically the Judgment
20 requires certain compliance with the agreement
21 concerning the Harrison County Jail and the conditions
22 there?
23     A.   Yes.
24     Q.   And what does the Board of Supervisors do to
25 ensure compliance with this Consent Judgment?

PAGE 6

6

1     A.   Appropriate the funds that are necessary to
2 maintain the personnel at the jail that the Consent
3 Decree required.
4     Q.   Anything else?
5     A.   That's all I can think of that we were
6 required to do.
7     Q.   So your understanding of the Judgment is the
8 only thing Harrison County, Mississippi is required to
9 do is fund -- give appropriate funds for the operation
10 of the jail?
11     A.   That's my understanding, that we were --
12 that's all we're required to do. And I think that's
13 all we legally could do as far as I know.
14     Q.   And then as far as use of the funds that's
15 given to the sheriff, how does the Board monitor that
16 to ensure the funds are used, what they are
17 appropriated for?
18     A.   Well, the one -- the one thing that we -- the
19 only thing that we could do was line item, which we did
20 do under certain circumstances, to line item the budget
21 to make sure that the funds were being used for their
22 intended purpose. If we needed jailers, then we'd line
23 item the budget to make sure that it went into jailers
24 and not into administration or any other area.
25     Q.   And when you would do a line item like that,

PAGE 7

7

1 is the sheriff required to produce documentation to
2 support his expenditure of the funds?
3     A.   Yes, he was.
4     Q.   And how long has the line item been used?
5     A.   As far as I know, the line item has only been
6 used in the last four years. I think the last four,
7 maybe five years.
8     Q.   If you would turn to page sixteen, Exhibit 1.
9     A.   Well, this is an exhibit that came in to
10 existence prior to my being a member of the Board.
11     Q.   I understand.
12     A.   Okay.
13     Q.   I didn't ask you if you negotiated it.
14         All right. Look at paragraph forty.
15     A.   Yes.
16     Q.   In that paragraph, it requires that status
17 reports be given to the District Court and the United
18 States. Do you see that?
19     A.   Yes, I do.
20     Q.   Have you ever been given copies of those
21 status reports?
22     A.   I don't know if I have or not. I know that
23 on several occasions, I requested status reports from
24 the sheriff's department.
25     Q.   And one of the supervisors had referenced a

PAGE 8

8

1 minute entry -- at least one minute previously where
2 you had requested such reports. But you don't ever
3 remember seeing them?
4     A.   I don't remember. I know that we got verbal
5 reports from a representative of the sheriff's
6 department, and not the sheriff himself. But at some
7 point, I was concerned about the verbal reports and
8 requested written reports. Now, I don't know if they
9 ever provided those or not.
10     Q.   Do you remember what your concerns were when
11 you requested the written report?
12     A.   My concern was to make sure that jailers were
13 being hired -- that the number of jailers were being
14 hired, that they were being trained, and that the funds
15 were being used for that purpose.
16     Q.   And when you say the sheriff normally
17 wouldn't appear, he would send a representative?
18     A.   The sheriff never appeared. Maybe in the
19 first year of his first term he may have appeared for a
20 short period of time, but after that, he never appeared
21 at a Board meeting.
22     Q.   Who would he normally send to the Board?
23     A.   An employee by the name of Robert Parker.
24     Q.   Do you know what Mr. Parker's job is at the
25 sheriff's department?

DEPOSITION OF WILLIAM MARTIN — MARCH 12TH, 2008

PAGE 9  SHEET 3

9

1    A.   I don't know what his title is, but as far as
2  -- I know he's supposed to be the numbers man at the
3  sheriff's department insofar as finances and things of
4  that nature. I don't know what his title is. Maybe
5  he's the finance officer. I don't -- I don't know
6  that.
7    Q.   All right.
8    A.   But it got to -- well --
9    Q.   Okay. But, anyway, you're aware, since
10 you've been a member of the Board of Supervisors, that
11 these reports are supposed to be submitted quarterly?
12   A.   Yes.
13   Q.   And --
14   A.   But that's -- I believe the reports were
15 supposed to submitted to the Justice Department. And
16 I assume that the sheriff's department was submitting
17 those to the Justice Department.
18   Q.   Okay.
19   A.   Or else the Justice Department would have
20 taken action.
21   Q.   Yeah. Well, I'm just asking whether or not
22 you've ever seen in eight years -- the seven or eight
23 years you've been in service, whether you've ever seen
24 one, and you're telling me you don't remember seeing
25 one, right?

PAGE 10

10

1    A.   No, I don't.
2    Q.   All right. So as far as monitoring the use
3  of the funds that are appropriated to the sheriff, that
4  is done by what mechanism?
5    A.   That is done by us maintaining -- well, we --
6  every year the sheriff has to submit a budget. And
7  quarterly, we check and make sure that they are within
8  their budget. Okay. In order for them to get
9  something outside of their budget, they have to come
10 in to the Board's office and ask for a budget
11 increase. So our -- the County Administrator keeps
12 up with that. And if they're over budget, then we
13 would be informed.
14   Q.   The County Administrator would be Ms.
15 Ulrich?
16   A.   Correct.
17   Q.   And she's the been County Administrator
18 during the time you have been on the Board?
19   A.   Yes, she has.
20   Q.   During the time you've served on the Board,
21 have there been instances where lawsuits have been
22 filed against the Harrison County Sheriff's Department
23 concerning alleged abuse at the Harrison County Jail?
24   A.   Yes.
25   Q.   Have you ever had an opportunity to review

PAGE 11

11

1  any of those lawsuits?
2    A.   I have.
3    Q.   How is the Board kept apprised of the
4  progress of the suits or what's going on with the
5  lawsuits?
6    A.   What happens is, when we get a lawsuit,
7  generally we get served. I don't know if every Board
8  member gets served, but I know that the president gets
9  served. We all get copies of basically, I think, the
10 Complaint. And then our attorney is notified, and he
11 files a response. And in regards to the ongoings of
12 that lawsuit, generally speaking, our attorney keeps
13 us informed. Very seldom do I know of that the County
14 has basically remained in any of those lawsuits. They
15 end up, I think, going against, for the most part, the
16 sheriff.
17   Q.   And who is responsible for paying the legal
18 expenses of the sheriff?
19   A.   Unfortunately, the Board of Supervisors.
20   Q.   In the cases where the County is dismissed
21 and the bills are submitted to the Board for the
22 sheriff, is any report submitted to the Board
23 concerning those expenses or --
24   A.   Yes. All expenses for attorneys, experts or
25 any other fees in regards to the defense of the Board,

PAGE 12

12

1  the sheriff, any employees of the sheriff, are all
2  submitted by filing a request for payment with the
3  bills attached and the reasons for those bills. And I
4  just know from the -- no, never mind.
5    Q.   Well, other than bills being attached, is
6  there any explanation of the bill or the progress of
7  the suit attached with the request for payment?
8    A.   I mean, a deposition, they submit how long it
9  took and what their bill was hourly. They basically
10 state what the action was that the bill was being
11 submitted for. But they don't give us a -- I mean,
12 maybe not a progress report on the case, but, I mean,
13 generally speaking as an attorney, I kind of could
14 figure it out just from the bill where they were in the
15 case.
16   Q.   They itemize the services they've rendered?
17   A.   Correct. I --
18   Q.   Go ahead.
19   A.   I mean, just from talking to the sheriff's
20 attorney, which I have done on a number of occasions,
21 my understanding is that they haven't lost any of those
22 lawsuits.
23   Q.   Have they settled any of them?
24   A.   I think they may have settled two or three.
25   Q.   Since you've been on the Board?

DEPOSITION OF WILLIAM MARTIN                         MARCH 12TH, 2008

PAGE 13  SHEET 4

13

1    A.    Since I've been on the Board. I can only
2    remember them -- seeing where they settled maybe two or
3    three cases of allegations of abuse.
4         MR. MEADOWS: Off the record.
5              - - -
6              (Off the record.)
7              - - -
8    BY MR. PRINGLE:
9    Q.    Do you know if there are any other pending
10   litigation concerning alleged abuse at the jail, other
11   than this case?
12   A.    Of course.
13   Q.    Do you know approximately how many cases?
14   A.    I have no idea. They seem to be coming out
15   of the woodwork as a result of the number of sheriff's
16   deputies -- oh, not deputies, but jailers that ended up
17   entering guilty pleas in Federal Court, we now are
18   receiving numerous lawsuits.
19   Q.    Okay. Let me show you Exhibit 2. I'll give
20   you a chance to look at it and see if you have ever
21   seen that before.
22   A.    I think I've seen this before or heard of it
23   before, at least. I don't know if I read it in its
24   entirety.
25   Q.    Look at page one, if you don't mind. The

PAGE 14

14

1    page numbers are on the bottom.
2    A.    Okay.
3    Q.    At the very top, it says, In the later part
4    of 2006, Sheriff George Payne and Warden Cabana of the
5    Harrison County Sheriff's Department submitted a
6    request for technical assistance to the National
7    Institute of Corrections - Jail Center in Longmont,
8    Colorado; is that correct?
9         Is that what it says?
10   A.    Yes.
11   Q.    Was the Board informed that Sheriff Payne and
12   Warden Cabana were requesting this assistance?
13   A.    I don't know. If it required that this
14   assistance be financed, then I'm sure they did.
15   That's the only way they would be able to get the
16   Board to pay for it. But whether or not they -- if it
17   was something that was being done with a -- even if it
18   was done with some type of grant, they still would
19   have informed us of it. But I don't know if they were
20   required to get our permission, if that's what you're
21   asking.
22   Q.    Not so much that as this, if they informed
23   you that they were requesting for it or if they
24   submitted a request for payment or any information that
25   you had about it being requested before it was done?

PAGE 15

15

1    A.    I don't remember. They may have. It would
2    not have been unusual for them to inform us of whatever
3    action they were taking. But unless it had -- unless
4    it involved something that had to be paid for....
5    Q.    Okay. Do you have any independent knowledge
6    of a request for payment to the National Institute of
7    Corrections?
8    A.    No, I don't.
9    Q.    Let me ask you about some of this. Turn to
10   page two. In the second paragraph, it says,
11   "Detention staff does not uniformly receive annual
12   pre-service training and annual in-service programs
13   are not being regularly provided. The majority of
14   training is currently on-the-job."
15        Were you aware that this finding had been
16   made in this report?
17   A.    No, but I'm not surprised at it.
18   Q.    It doesn't surprise you that there's been
19   lack of training at the jail?
20   A.    All I can tell you is that on numerous
21   occasions I questioned the sheriff's department in
22   Board meetings about the training of at least new
23   officers coming on, on the job.
24   Q.    Okay.
25   A.    And they informed us that they were, in fact,

PAGE 16

16

1    being trained properly.
2    Q.    Did the sheriff's department ever submit
3    their training program to the Board?
4    A.    No. But, I mean, I don't know what -- even
5    had they submitted it to me, I don't know how the
6    sheriff's office or the jailers are supposed to be
7    trained, so I would just have been reading, basically.
8    I mean, I don't know the day-to-day operations of the
9    sheriff's department or the jailers or booking people
10   in or anything else, so submitting it to me really
11   wouldn't have been of much benefit as far as I'm
12   concerned.
13   Q.    Okay. Bottom of page two. It says, "The
14   morale of the staff was extremely low. Staff claimed
15   they are over worked."
16        Were you aware of that finding?
17   A.    I wasn't aware of that finding, but I was
18   aware the staff -- that the morale of the staff was
19   extremely low. That was in 2006, the latter part of
20   2006.
21   Q.    How were you informed of that or how did you
22   learn that?
23   A.    Well, I'm a criminal defense attorney. I
24   was aware of the Williams case and I knew that morale
25   after that case was extremely low. In fact, I thought

PAGE 17 SHEET 5

17

1  it was low prior to that case, but that's because, I
2  mean, I spend a lot of time at the jail, not as a
3  Board of Supervisor but as an attorney.
4     Q.  Are you still doing criminal defense work?
5     A.  Of course.
6     Q.  How long have you been doing that?
7     A.  Since I left the District Attorney's office
8  in April of 1996.
9     Q.  Go to page three. First paragraph, middle
10 of the page, it says, Dr. Cabana stated there were
11 approximately fifty-seven staff vacancies. Were you
12 aware of that finding?
13    A.  I was not aware of that particular finding.
14 I did know that there were staff vacancies, but
15 everybody knew there were staff vacancies.
16    Q.  Did you ever have any conversation with Mr.
17 Cabana, individually or at the Board meetings or
18 executive session, as to what was causing the staff
19 vacancies?
20    A.  I know that -- of course, I have had a
21 conversation with Mr. Cabana in the Board meetings,
22 individually, at meetings at the jail, in regard to
23 staff vacancies and I knew -- I knew that the reason
24 was because, number one, morale; number two, the
25 Williams case had a lot to do with the morale; number

PAGE 18

18

1  three -- I mean, basically it all came back to
2  morale. I mean, if you don't have any, I guess,
3  support for the hierarchy of the jail, then you don't
4  want to work there. It was hard to find people to
5  work here. After Katrina, I mean, everything else was
6  driving everything up.
7        That's why now, I mean, you know, our
8  salaries -- we have taken those salaries up so that
9  people will come back and begin working at the jail.
10 I mean, that's the only way we're going to get them
11 back. I think our salaries are probably higher than
12 the salaries on average.
13    Q.  Mr. Cabana made numerous changes in the
14 booking area?
15    A.  I don't know.
16    Q.  Did he talk to you about making changes in
17 the booking area?
18    A.  Not per se the booking area itself. He
19 talked about making changes at the jail. I don't
20 think we looked at any particular department, but at
21 the jail overall.
22    Q.  Did you have any conversations with him
23 about the violence that allegedly has occurred at the
24 booking area towards inmates and jailers pleading
25 guilty to it?

PAGE 19

19

1     A.  Not until after the fact.
2     Q.  That would've been after he was appointed
3  warden at the jail?
4     A.  Yes.
5     Q.  Look at the bottom of page three.
6     A.  Okay.
7     Q.  In the last paragraph it says, "Due to
8  inadequate staffing levels, poorly trained staff,
9  limited supervision, crowded conditions, failure to
10 follow established policies and procedures, inadequate
11 classification options and intake/release process that
12 is inefficient and ineffective, the Harrison County
13 Detention Center is neither safe nor is it secure."
14       Were you aware of that finding?
15    A.  Not from this particular report, but I was
16 aware of those conditions.
17    Q.  You didn't need this report to tell you that?
18    A.  No. Mr. Cabana was basically telling us
19 that every time he saw us, and we were taking actions
20 to try and correct that.
21    Q.  Well, were you aware of these conditions
22 before Mr. Cabana was telling you about them?
23    A.  No. I was aware -- let me put it like
24 this. I was aware of the staffing issues, okay. Let
25 me see what else this paragraph says. I was aware of

PAGE 20

20

1  the staffing levels, and that's it out of this
2  paragraph. Their training and limited supervision --
3  I was aware of the crowded conditions, also. Failure
4  to follow sustained policies and procedures, I was not
5  aware of that, was not aware of that.
6        The only thing I was aware of was inadequate
7  staffing levels and crowded conditions, which is
8  something that -- I mean, the whole county was aware
9  of the crowded conditions if you read the newspaper.
10 There had been committees formed to try and look at a
11 lot of options to deal with that.
12    Q.  What kind of committees?
13    A.  I don't know the name of the committee, but
14 I served on a committee at the jail, at the Harrison
15 County Jail, where I got to meet the sheriff every now
16 and then. I'm about the only supervisor that got to
17 see him. I served with judges from every level;
18 justice court, city court, circuit court, chiefs of
19 police. We were looking for alternative means of --
20 something alternative to housing somebody at the jail,
21 alternative sentencing, alternative pretrial release,
22 trying to help control the conditions at the jail.
23       Out of that was born -- not really born, but
24 out of that came the full-time public defenders
25 office, which we finally got done January of last

PAGE 21  SHEET 6

21

1  year, January of 2007, something that we had been
2  looking at for at least six years.
3          MR. MEADOWS: Woody, to assist him in his
4      testimony, do you have that exhibit over there
5      on the -- I don't know if it's 1 or 2.
6          MS. YOUNG: It's Exhibit 4.
7          MR. MEADOWS: Exhibit 4. Have you got it so
8      he can look at that?
9          MR. PRINGLE: Yeah. I'll come back to it.
10 BY MR. PRINGLE:
11     Q.  Go to page seven.
12     A.  Page seven.
13     Q.  Third paragraph, it says, "This consultant
14 then interviewed Sheriff Payne regarding this
15 technical assistance visit. Sheriff Payne voiced
16 concern about violence in the facility and he placed
17 hope that Dr. Cabana could institute levels of change
18 that could prevent future reoccurrence of violence in
19 the booking area."
20         Were you aware that Sheriff Payne had voiced
21 this concern to this consultant?
22     A.  I'm sure he had. But this report is -- this
23 doesn't have a time period on it. All I know is it
24 looks like it was -- a disclaimer was filed March 6th
25 of 2007. That's kind of like after the cow is already

PAGE 22

22

1  out, ain't it?
2      Q.  Okay. Did you ever have a chance to talk to
3  Sheriff Payne about his concerns about violence in the
4  booking area?
5      A.  Prior to this or before this report?
6      Q.  At any time.
7      A.  Yeah, prior to this. I haven't talked to
8  sheriff after this report. I haven't talked to the
9  sheriff -- I can't even remember the last time I
10 talked to sheriff. I know I talked to the sheriff
11 about my concerns about violence in the jail prior to
12 this report over a number of years.
13     Q.  What were your concerns about it?
14     A.  Well, periodically the Board received
15 written complaints from inmates that they were being
16 beaten. We turned those complaints over to the
17 District Attorney's office for investigation.
18     Q.  You talked to the sheriff about your
19 concerns?
20     A.  Yeah.
21     Q.  What was his response to your concerns?
22     A.  That they were working on it. That was the
23 purpose of -- one of the purposes of the Harrison
24 County Criminal Justice Coordinating Council was to
25 try and -- everything was related back to

PAGE 23

23

1  overcrowding.
2      Q.  So when you would voice a concern, he would
3  say they were working on it?
4      A.  Uh-huh (indicating yes).
5      Q.  Did you have conversations with him on a
6  number of occasions about violence in the jail?
7      A.  No, not that many times.
8      Q.  More than one?
9      A.  Maybe two.
10     Q.  I'll show you Exhibit 3. Let me swap with
11 you. Take a look at that and see if you have seen
12 that before, and there actually is a date on the front
13 of that one.
14     A.  Okay. Yes, I have see seen this.
15     Q.  On page one, first paragraph, second
16 sentence, it says, "The six previous reports have
17 detailed numerous, serious and persistent problems
18 related to overcrowding, staffing and security."
19         Had you seen any of those six previous
20 reports?
21     A.  I don't know if I'd seen them or not. I
22 knew about their existence, though.
23     Q.  But do you remember actually looking at this
24 one?
25     A.  No.

PAGE 24

24

1      Q.  All right. Look at page two.
2      A.  Okay.
3      Q.  Page two, second paragraph, third sentence
4  says, "I thereafter conducted and on-site review of
5  recent incident reports."
6          Were you ever given copies of those reports?
7      A.  No.
8      Q.  Do you remember ever seeing this sentence in
9  this report prior to today?
10     A.  No.
11     Q.  Had you ever requested any type of incident
12 reports from the sheriff concerning alleged abuse at
13 the jail?
14     A.  No.
15     Q.  Go to page seven, second paragraph. It
16 says, "1. Staff Use of Force." Do you see that?
17     A.  Yes.
18     Q.  Second sentence, it says, "As
19 aforementioned, there were thirty-one incidents of
20 force in December 2004, which represents a serious
21 increase in the use of force at HCDC."
22     A.  Wait. Hold on.
23     Q.  Page seven?
24     A.  Page seven, second paragraph.
25     Q.  Second sentence?

PAGE 25 SHEET 7

25

1  A.  Second sentence.
2  Q.  It says, As aforementioned?
3  A.  That's the third sentence. Okay. I'm
4  sorry. Second sentence, you're right. Third line.
5  As aforementioned, okay.
6  Q.  "In reviewing the use of force incident
7  packages for November/December 2004, a very disturbing
8  patter of misuse of force is evident."
9      Were you aware of this finding?
10 A.  No.
11 Q.  Did you ever receive any reports or packages
12 concerning alleged use of force in the jail?
13 A.  From?
14 Q.  From anybody.
15 A.  The only thing I received from the jail was
16 some complaints from inmates, written complaints,
17 which I forwarded to the District Attorney's office
18 for investigation.
19 Q.  How did you come into possession of those?
20 A.  They mailed them to us.
21 Q.  Other than the reports or letters you got
22 from inmates, did you ever get any of the grievances
23 that were filed through the sheriff's department by
24 inmates?
25 A.  Did I ever get --

PAGE 26

26

1  Q.  Let me start over. Were you aware that the
2  sheriff has an inmate grievance procedure where an
3  inmate can file a grievance concerning conditions at
4  the jail? Did you know that?
5  A.  Yes, I did.
6  Q.  Were you ever given copies of any of those
7  grievances that were filed through the sheriff's
8  department procedure by the inmates?
9  A.  No, unless -- all I know is whatever -- what
10 was sent to me came from the inmates and I forwarded
11 that to the District Attorney's office. Now, if they
12 sent me their grievance, I don't know. Whatever they
13 sent me, I sent it to the DA's office because somebody
14 needed to look at it other than me.
15 Q.  Okay. July 20th, 2005, that was the date of
16 a letter from the U.S. Justice Department to Harrison
17 County concerning concerns the Justice Department had
18 about conditions at the jail. Did you ever have a
19 chance to look at that letter?
20 A.  I don't know. I'm sure I did if it came to
21 the Board.
22    MR. MEADOWS: Woody, let me interpose a
23    question here at this point. Can you further
24    identify this letter? I mean, what -- you
25    apparently know all about it, and I don't. I'd

PAGE 27

27

1  just like to know what we're talking about.
2     MR. PRINGLE: It's all in different reports
3     from the Justice Department that I've read in
4     discovery, but nobody seems to have the letter.
5     MR. MEADOWS: Can you give me an example of
6     where they refer to it in one of the reports so
7     I can try to find it for you?
8     MR. PRINGLE: I'll send it to you.
9     MR. MEADOWS: Thank you.
10    MR. PRINGLE: I mean, I've sent it before,
11    but I'll send it again.
12 BY MR. PRINGLE:
13 Q.  You don't have any independent recollection
14 of it at this point?
15 A.  No.
16 Q.  It was a letter which allegedly -- or a
17 letter which voiced concerns of the Justice Department
18 at that time about instances of misuse of force in the
19 jail. Does that refresh your memory?
20 A.  No.
21 Q.  You know the sheriff's department has a
22 Civil Service procedure for alleged claims of
23 misconduct against jailers and other officers at the
24 jail?
25 A.  I know they've got a Civil Service

PAGE 28

28

1  Commission that conducts hearings, not just on those
2  issues.
3  Q.  Have you ever had a chance to discuss any of
4  the Civil Service hearing findings?
5  A.  No, other than when I represented somebody
6  before that felt like they had been wrongfully
7  disciplined or discharged by the sheriff.
8  Q.  That would've been representing deputies?
9  A.  Yes, or former deputies.
10 Q.  Have you ever reviewed the sheriff's
11 department policies and procedure?
12 A.  In regards to my representation of those
13 clients, yes, I did.
14 Q.  Did you ever review any of the sheriff's
15 general orders?
16 A.  Not unless they applied to those -- I think
17 I only represented one or maybe two people before the
18 Civil Service Commission a long time ago. That's the
19 only time I would've been concerned with reading
20 anything that they had.
21 Q.  All right. Look at Exhibit 4. Is that the
22 committee that you were referencing earlier?
23 A.  Yes, it is, the Harrison County Criminal
24 Justice Coordinating Council, yes.
25 Q.  What was the reason this committee was

**29**

1  formed or this council?
2  A.  The reason that this committee was formed
3  was to try and deal with the entire criminal justice
4  system, not just the jail. But as a result of the
5  entire criminal justice system, we felt like that had
6  an impact on overcrowding at the jail, so that's why
7  we wanted to look at, as you see listed here, the
8  public defender system, pretrial screening and
9  supervision programs, examine the bail bond system,
10 examine the day reporting system, better jail and
11 population information.
12     All that refers to the entire criminal
13 justice system. I mean, how fast can we get a state
14 inmate out of jail and into the state system? How
15 long do we have to hold these probationers who have
16 been returned here from -- all inmates that return
17 here from the state for a hearing when they had their
18 hearing a month ago and they're still sitting here six
19 months later, that type of stuff. Trying to get
20 people who shouldn't be in the jail out of the jail
21 and also trying to get people who didn't have to be in
22 the jail out of the jail.
23 Q.  Were the meetings of this council recorded
24 in any manner?
25 A.  No, not that I know of. No, they weren't

**30**

1  recorded. There may have been somebody taking notes.
2  I'm sure we had somebody taking notes, but it wasn't
3  me.
4  Q.  When I say "recorded," I don't necessarily
5  mean just audio or visual, but like minutes or
6  anything like that.
7  A.  I think somebody was taking minutes, someone
8  from the sheriff's department. I don't know who it
9  was.
10 Q.  All right. Attached to that, I didn't
11 attach the entire report, but there's a page twenty.
12 A.  I'm looking at that.
13 Q.  At the top it says, List of Issues with
14 Voting Totals.
15 A.  Okay.
16 Q.  What were y'all voting on?
17 A.  I think we were voting on what should be the
18 highest priority.
19 Q.  Got you, okay. When you go into this box,
20 it says Issue, and then the fourth one down says,
21 "Resolve federal court order consent decree"; is that
22 correct?
23 A.  Yes.
24 Q.  Do you remember what the council was working
25 on as far as trying to resolve the federal court

**31**

1  order?
2  A.  Well, the main thing in trying to resolve
3  the federal court order was get the overcrowding of
4  the jail down, get the number of jailers up that
5  you're supposed to have in regard to the requirement
6  of the federal decree, basically to meet the
7  requirements of that federal decree so we could get
8  from under this order at some point in our lifetime.
9  Q.  Did the committee talk about the staff
10 training at the jail?
11 A.  I don't remember talking about staff
12 training. The only thing I remember talking about in
13 regards to staff was how I was going to be able to
14 convince the rest of the Board of Supervisors to give
15 them more money so that they could increase the
16 salaries at the jail so that they could get enough
17 staff people out there. That's what I remember. I
18 was basically, I guess, the go-between between this
19 committee and the funding, which was the Board. I was
20 trying to finagle and do that without, you know, too
21 much...Laugh.
22 Q.  I attached page twenty-three also to that,
23 if you will look at that. It says, "Priority Area #5:
24 Federal Court Order Monitoring" --
25 A.  It's even got my name on this page. Says

**32**

1  what now?
2  Q.  "Federal Court Order Monitoring and Eventual
3  Elimination." Do you see that?
4  A.  Yes.
5  Q.  It says, "Chairperson: Don Cabana."
6  A.  Okay.
7  Q.  Did Mr. Cabana ever submit any written
8  reports to the council?
9  A.  I don't remember. I don't remember if he
10 submitted written reports. He may have. I'm not
11 sure.
12 Q.  Number two, it says, "Monitor activity and
13 report back to committee on a regular basis." Was
14 that done?
15 A.  I don't know.
16 Q.  Do you remember him reporting back to you on
17 the council?
18 A.  I don't remember. I mean, I can't even tell
19 you which one of these meetings I went to. I didn't
20 go to all of them. I tried to go to as many as I
21 could. But, you know, after a while, I kept begging
22 the sheriff to come to the Board meetings, and after
23 he wouldn't come to our meetings, you know, I almost
24 had to quit going to his.
25 Q.  All right. This was a committee that the

PAGE 33 SHEET 9

33

1  sheriff asked to form?
2     A.  Not really.  It was a committee that the
3  judges -- I think the sheriff did really start it.  He
4  had the biggest interest, I think, in trying to get
5  conditions, staffing, and stuff under control at the
6  jail.  But, I mean, we all had concerns about trying
7  to improve the criminal justice system in Harrison
8  County.
9     Q.  I think this committee has not met anymore
10 since Hurricane Katrina.  Does that sound right?
11    A.  I haven't met with this committee.  I can't
12 remember.  I don't know.  It may have been since
13 Hurricane Katrina.  I know that prior or before that I
14 haven't met with them after I fell out with some
15 issues.  It's my way or the highway.
16    Q.  Not surprising.  Have you ever had any
17 chance to review any of the videos from the booking
18 area?
19    A.  No.  They tried to show them to me.  I
20 didn't want to see them.
21    Q.  Who tried to show them to you?
22    A.  I think at one point the U.S. Attorney's
23 office had them, and they said that we could look at
24 them.  I think we decided to send only one person, our
25 president at the time, which was Mr. Benefield.  I

PAGE 34

34

1  don't want to see it.  I think they were on the
2  Internet, too, at some point.  I haven't seen that
3  either.  I guess you mean in regards to the Williams
4  beating, right, or do you just mean their video system
5  that they have now that was on the Internet until the
6  new sheriff took over?
7     Q.  Yeah.  Let me ask you this.  Other than the
8  Williams, have you reviewed any videos of alleged use
9  of force in the booking area?
10    A.  I saw one other video somewhere.  I didn't
11 see the Williams.  I saw a video.  I don't even
12 remember where it was, somewhere, a video of another
13 allegation of abuse, but that was a female.  I don't
14 know who it was.  I know that that suit was dismissed,
15 too, in Federal Court, even after the video, if I
16 remember correctly.
17       MR. PRINGLE:  That's all I have.  Thank
18 you.
19          - - -
20        EXAMINATION
21 BY MS. YOUNG:
22    Q.  I just have a few, William.  You're
23 president of the Board of Supervisors, right?
24    A.  President, yeah.
25    Q.  The Harrison County Board of Supervisors,

PAGE 35

35

1  y'all don't have any right to control the day-to-day
2  operations at the jail, do you?
3     A.  No, we don't.  I wish we did.  No, I don't.
4  I don't even wish we did.  I take that back.
5     Q.  Do y'all set any policies or procedures of
6  the Sheriffs of Harrison County?
7     A.  No, we don't.
8     Q.  Do you have any right to tell the sheriff
9  how to train his deputies?
10    A.  No, I don't.  I wouldn't know how to train
11 them.
12    Q.  Do you have the right to tell the sheriff
13 who to hire or fire?
14    A.  No.
15    Q.  What is the Board's -- the sheriff's current
16 budget?  Is it about a million dollars or --
17    A.  I know it's about almost twenty million.
18    Q.  Twenty million, okay.
19    A.  Almost, and it's growing every time I look
20 at it.
21    Q.  Are you aware that that is probably the --
22 it might be the highest budget in the state or the
23 second highest budget in the state?
24    A.  Yes, I'm aware of that, but we're a pretty
25 large county.

PAGE 36

36

1     Q.  I believe that in preparation of this
2  deposition there's been a minutes search regarding the
3  Harrison County Adult Detention Center, correct?
4     A.  Correct.
5     Q.  I'm going to --
6     A.  Let me say this, though.  I don't think this
7  was in preparation for this budget.  This was done
8  after the sheriff threatened to drag a door to the
9  Board meeting.
10    Q.  Okay.  It's a minutes search?
11    A.  Yes, of our funding for the jail and
12 security, I think, over the last five years.
13       MS. YOUNG:  I'm going to mark that as an
14 exhibit to this deposition, Woody.
15       MR. PRINGLE:  Sure, as long as I get access
16 to every minute entry of Harrison County,
17 Mississippi.
18       MR. MEADOWS:  The only thing you have to do
19 if you want the actual minutes -- excuse me, let
20 her mark it.
21          - - -
22    (Whereupon, Exhibit 5 was marked.)
23          - - -
24       MR. PRINGLE:  I don't care if you mark it.
25 I don't have any objection.

PAGE 37 SHEET 10

37

1  MR. MEADOWS: Woody, on this, if there's
2  something specifically on this exhibit that you
3  want, it has indicated the date and the number
4  and that's how they'll access it for you. Any
5  other minutes that you want, if you'll just tell
6  them what you want, they'll do a minute search
7  and get that for you.
8  MS. YOUNG: I don't have any more
9  questions. Thank you.
10              - - -
11         FURTHER EXAMINATION
12 BY MR. PRINGLE:
13     Q.   I'm going to ask you some very obvious
14 questions, but I'm going to ask them anyway. Is it
15 the Sheriff George Payne Jail?
16     A.   Say what?
17     Q.   Is the Sheriff George Payne Jail?
18     A.   Let me say this.
19         MR. MEADOWS: I object.
20 BY MR. PRINGLE:
21     Q.   Is it called the Sheriff George Payne Adult
22 Detention --
23     A.   No, it's the Harrison County Adult Detention
24 Center. However, I went to the legislature myself to
25 try and lobby and did lobby to try and get

PAGE 38

38

1  privatization myself, and Connie Rocko. You sent me
2  up there. You didn't go with me.
3      Q.   The TV cameras aren't here; the
4  closed-circuit TV cameras are here.
5      A.   But in any event, I went up there and
6  lobbied hard to try and get permission, a local and
7  private bill passed, to allow us to privatize the jail
8  without the sheriff's consent and we lost.
9      Q.   It's called the Harrison County Adult
10 Detention Center, right?
11     A.   Yes.
12         MR. PRINGLE: Thank you.
13              - - -
14            (Witness excused.)
15 (The deposition was concluded at 2:25 p.m.)
16              - - -

39

1            CERTIFICATE
2  STATE OF MISSISSIPPI
3  COUNTY OF HARRISON
4      I, Lisa Hood Brown, Freelance Court Reporter
5  and Notary Public, duly commissioned for the County
6  of Harrison, State of Mississippi, do hereby certify:
7      That on the 12th day of March, 2008, there
8  appeared before me WILLIAM MARTIN, who was sworn and
9  examined to tell the truth, and that the00X