DEPOSITION OF CONNIE ROCKO  MARCH 12TH, 2008

## PAGE 1  SHEET 1

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 3                   SOUTHERN DIVISION
 4
 5   KASEY D. ALVES,
 6          Plaintiff,
 7   VS.              CAUSE NO.: 1:06cv912 LG-JMR
 8   HARRISON COUNTY MISSISSIPPI, BY AND
     THROUGH THE BOARD OF SUPERVISORS;
 9   HARRISON COUNTY SHERIFF'S DEPARTMENT;
     SHERIFF GEORGE PAYNE, JR.; AND,
10   HEALTH ASSURANCE, LLC.,
11          Defendants.
12
13                      DEPOSITION
14                         OF
15                     CONNIE ROCKO
16          Taken on behalf of the Plaintiff
17       2:26 p.m., Wednesday, March 12th, 2008
18                       before
19             Lisa H. Brown, CSR #1166
20
21
22
23              COAST-WIDE REPORTERS
                    Court Reporters
24               Post Office Box 95
             Biloxi, Mississippi  39533-0095
25                 (228) 374-5066
```

## PAGE 2

```
 1         The deposition of CONNIE ROCKO, taken on the
 2   12th day of March, 2008, commencing at 2:26 p.m., at
 3   the offices of the Harrison County Board of
 4   Supervisors, 1831 23rd Avenue, in the City of
 5   Gulfport, County of Harrison, State of Mississippi,
 6   before Lisa Hood Brown, CSR, Freelance Court Reporter
 7   and Notary Public within and for the County of
 8   Harrison, State of Mississippi.
 9
10   APPEARANCES:
11         WOODROW W. PRINGLE, III, ESQUIRE
           2217 Pass Road
12         Gulfport, Mississippi  39501
           Appearing on behalf of the Plaintiff.
13
           JON S. TINER, ESQUIRE
14         Dukes, Dukes, Keating & Faneca
           2909 - 13th Street, Sixth Floor
15         Gulfport, Mississippi  39501
           Appearing on behalf of the Defendant,
16              Sheriff George Payne, Jr.
17         JOSEPH MEADOWS, ESQUIRE
           KAREN J. YOUNG, ESQUIRE
18         Meadows Law Firm
           Post Office Drawer 1076
19         Gulfport, Mississippi  39502
           Appearing on behalf of the Defendant,
20              Harrison County Board of Supervisors.
21         ROBERT H. PEDERSEN, ESQUIRE
           Watkins & Eager
22         400 East Capitol Street
           Jackson, Mississippi  39205
23         Appearing on behalf of the Defendant, Heath
                Assurance, LLC.
24
25
```

## PAGE 3

```
 1                     I N D E X
 2
 3   CONNIE ROCKO:                              PAGE:
 4       EXAMINATION
 5            By Mr. Pringle --------------- 4
 6            By Ms. Young ----------------- 16
 7                       - - -
 8                     E X H I B I T S
 9                       - - -
10       REPORTER'S CERTIFICATE ------- 18
11                       - - -
12       ERRATA SHEET ----------------- 19
13                       - - -
```

EXHIBIT B

## PAGE 4

```
 1                       - - -
 2                    CONNIE ROCKO,
 3   having first been duly sworn, was examined and
 4   testified as follows:
 5                       - - -
 6                     EXAMINATION
 7   BY MR. PRINGLE:
 8        Q.   Please state your name.
 9        A.   Connie Rocko.
10        Q.   Currently a member of the Harrison County
11   Board of Supervisors?
12        A.   Yes, sir.
13        Q.   For what period of time?  What years have
14   you served on the Board?
15        A.   2000 to present.
16        Q.   You have previously served as president of
17   the Board?
18        A.   Yes, sir.
19        Q.   On how many occasions?
20        A.   Once.
21        Q.   Do you remember what year that was?
22        A.   It was six months after the storm, so that
23   was 2006.  January 2006, that's right.
24        Q.   What is your understanding of the Board's
25   responsibility as concerning management of the
```

PAGE 5 SHEET 2

5

1  Harrison County Jail, if any?
2      A.  No management. However, we do appropriate
3  funds and budget. And in trying to clarify that, and
4  trying to seek some type of help, I went all the way
5  to -- the Board requested that we have an appointment
6  with the Attorney General. So, we met with the
7  Attorney General's office, Mr. Hood and one of his
8  assistants, and asked them if there was anything at
9  all that we could do. And he said, No. Appropriate
10 the budget, period. And that was in a face-to-face
11 conversation, myself and Mr. Benefield and Mr. Joe
12 Meadows.
13         MR. MARTIN: I didn't go.
14         THE WITNESS: I know, but was that -- I
15     can't remember the time frame. I can't remember
16     if it was after the privatization failed or
17     before. But it was in the month of January of
18     '06 or '07. When was the election?
19         MR. MEADOWS: '07.
20     A.  '07, I'm sorry, '07.
21 BY MR. PRINGLE:
22     Q.  Since your time on the Board, is it true
23 that the first time to try to get legislation passed
24 to privatize the jail would've been in 2006?
25     A.  Yes, sir.

PAGE 6

6

1      Q.  I understood that was not successful because
2  the sheriff would not agree; is that correct?
3      A.  I don't know that that was why it wasn't
4  successful. It was not successful because the house
5  passed it and senate did not.
6      Q.  The Board passed a resolution trying to seek
7  legislation to privatize the Harrison County jail; is
8  that correct?
9      A.  Yes.
10     Q.  Was the sheriff consulted concerning that
11 attempt to privatize the jail?
12     A.  Yes.
13     Q.  Did he agree or disagree?
14     A.  Through his employees. I never spoke with
15 him, but to my knowledge, he was not in favor of it
16 because Mr. Cabana was up there in Jackson lobbying
17 against it heavily.
18     Q.  That would be Don Cabana?
19     A.  Yes, sir.
20     Q.  And you said through of his employees. Who
21 were the employees that advised you that they were not
22 in favor of it?
23     A.  Pardon?
24     Q.  Who were the employees that advised you the
25 sheriff was not in favor of it?

PAGE 7

7

1      A.  It was, I would assume, either Mr. Cabana,
2  on 8-7-06 in the Board meeting -- the sheriff,
3  himself, did not say that, but it came from the
4  sheriff because we spread on the minutes a letter
5  requesting on 8-7-06 his opinion, and I don't believe
6  we ever got an opinion one way or the other, but his
7  employees, through his employees.
8      Q.  You made reference to a letter?
9      A.  This is the letter that the Board....
10     Q.  Okay. The Board wrote a letter to the
11 sheriff?
12     A.  Yes, sir. I'm sorry I wasn't clear on that.
13     Q.  That's all right. To your knowledge, no
14 response was ever received?
15     A.  No, sir. But when Mr. Cabana appeared in
16 Jackson and lobbied against it, we got the message.
17     Q.  How do you know Mr. Cabana appeared in
18 Jackson lobbying against it?
19     A.  It was a conversation that was being held
20 with Mr. Cabana and Supervisor Martin when a senator
21 came up to Mr. Cabana and said, I think we got this
22 killed, and Mr. Cabana said, Have you met Supervisor
23 William Martin?
24     Q.  Do you remember who the senator was?
25     A.  I don't remember. I don't know. It was

PAGE 8

8

1  hearsay from Mr. Martin.
2      Q.  Mr. Martin reported that to you?
3      A.  Uh-huh (indicating yes).
4      Q.  You weren't there?
5      A.  No, sir. I was e-mailing and that was how
6  we -- we e-mailed every house member and every senator
7  concerning this matter pleading with them.
8          MR. MEADOWS: Mr. Pringle, I'd like the
9      record to show that the letter or minutes
10     Supervisor Rocko was referring to is on page four
11     of Exhibit 5 marked number 92, dated August 7,
12     2006. Thank you.
13 BY MR. PRINGLE:
14     Q.  Why did you want to privatize the jail?
15     A.  We were very frustrated with reports --
16     Q.  What reports?
17     A.  -- and concerned. The Williams case.
18     Q.  Any other reports?
19     A.  I believe we -- no, that would be it, I
20 think, all that I can recall.
21         MR. MARTIN: This case.
22     A.  We had hearsay about this case, but I don't
23 know if we had a report on it or not. I can't
24 remember whether or not we had a specific at this
25 specific date and time. I think we had, but I don't

PAGE 9 SHEET 3

9

1  want to say something that's not right.
2      Q.   Sure, okay.  Was it the Williams case that
3  spurred the Board to move to try to privatize the Jail
4  or were there other factors also?
5      A.   I think there were many other factors also.
6  I think it was a lack of communication and a lack of
7  actually knowing what was going on in the Jail and
8  could it be managed better, could we be more aware of
9  some of the things that were going on.  I read about
10 the Williams case in the paper.
11     Q.   Let me show you Exhibit 1 which is a consent
12 judgment from the U.S. District Court.  During the
13 time you have been serving on the Board, have you had
14 a chance to review it or become aware of it?
15     A.   I became aware of it today.
16     Q.   Today?
17     A.   In these meetings.
18     Q.   That's the first time that you've seen it?
19     A.   Yes, sir, that I can recall.
20     Q.   Were you aware that it existed?
21     A.   Not that I can remember.
22     Q.   Okay.  I'll ask you to turn to page sixteen.
23 Look at paragraph forty.  You probably heard some
24 questions today earlier about these status reports
25 that are required to be submitted to the district

PAGE 10

10

1  court and the U.S. Attorney's office.  Have you ever
2  seen any of these status reports?
3      A.   No, sir.
4      Q.   Were you aware that they were supposed to be
5  submitted on a quarterly basis?
6      A.   No, sir.
7      Q.   Change with me and I'll show you Exhibit 2,
8  and I'll ask you if you've seen that before.
9      A.   Not that I can remember.
10     Q.   Have you had a chance to look at it today?
11     A.   I've perused it today, yes, sir, in these
12 depositions.
13     Q.   Would this be the first time, to your
14 knowledge, that you've seen Exhibit 2?
15     A.   Yes, sir, that I can recall.
16     Q.   Since you have been serving on the Board of
17 Supervisors have you had concerns about the operation
18 of the Jail?
19     A.   Yes, sir.
20     Q.   What have been your concerns?
21     A.   The -- I can't remember the exact date that
22 we started to be concerned about the overcrowding and
23 the actual staffing and morale, but that was one of
24 the biggest concerns, I believe, when it was brought
25 to our attention by the Justice Department as to how

PAGE 11

11

1  serious it was.  And those are the two documents I do
2  -- I do remember receiving that document concerning
3  the staffing and the line item adjustments to make
4  sure that there was funding for the appropriate amount
5  of jailers.
6      Q.   What report was that?  You said you received
7  a report concerning --
8      A.   It wasn't a report.  It was a letter.
9      Q.   A letter.
10     A.   After we had requested what our -- I believe
11 we requested from the Justice Department what could we
12 do with the budget to ensure that we had the jailers.
13 They said we could line item the budget, so we took
14 money out of administration and put it in the Jailer's
15 line item salaries.
16     Q.   That was a letter written to the Justice
17 Department?
18     A.   I believe so, a request.
19     Q.   And then the Justice Department responded to
20 you that you could do the line items?
21     A.   Yes, sir.  They more or less responded, We
22 don't care how you arrange your money.  We just want
23 to make sure that that is budgeted.  Then I believe
24 the Attorney General said we could line item.  That's
25 the way I recall it, best of my ability.

PAGE 12

12

1      Q.   Do you have any other concerns about the
2  jail?
3      A.   Now?
4      Q.   Let's say between 2000 and 2005, were you
5  concerned about the operation of the jail?
6      A.   After attending an accreditation by a
7  company -- I cannot remember the name.  I apologize.
8  They accredited the jail and told us, you know -- I
9  assumed that being -- hailing those accolades that our
10 jail was operating as it should.  And as one of the
11 few accredited jails in the United States, it did put
12 my mind at ease until some of the allegations started
13 to surface.
14     Q.   Is that accreditation by the American
15 Correctional Association?  Does that sound familiar?
16     A.   Had a ribbon cutting.  We had, you know -- I
17 know it was a ribbon cutting, but it was in the jail.
18 The former warden was there.  Cabana was not there at
19 the time.  He wasn't hired.  I apologize, but I cannot
20 remember the name of that.
21     Q.   That accreditation has been withdrawn now,
22 hasn't it?
23     A.   Yes, sir.  I think so.  But just recently,
24 the past six months, a year.
25     Q.   Would it have been after the American

PAGE 13  SHEET 4

13

1  Correctional Association was made a party defendant to
2  some of these lawsuits? Do you know if that's why
3  they decided to withdraw that?
4     A.  I don't know that, sir. I apologize.
5     Q.  So you have not seen Exhibit 2, to your
6  knowledge, prior to today?
7     A.  No, sir, not that I can remember. But, you
8  know, I'm not -- my memory -- I'm getting old.
9     Q.  I show you Exhibit 3 and ask you if you have
10 seen that prior to today.
11    A.  No, sir, not that I can remember.
12    Q.  Did you have a chance to look at it today?
13    A.  I have perused the areas that you have
14 pointed out, yes, sir.
15    Q.  Were you aware of any of those reports or
16 any of the information it in here prior to today?
17    A.  I was made aware of the overcrowding and
18 also the personnel shortage, not necessarily their
19 morale -- not before '05 -- their morale, or anything
20 about mistreating prisoners until -- I can't remember
21 the exact date, probably '05, '06.
22       MR. MARTIN: '06.
23    A.  '06. I'm sorry, '06.
24       MR. PRINGLE: You want to testify, William?
25       THE WITNESS: He's just helping me with my

PAGE 14

14

1  dates. You don't understand. All this --
2       MR. PRINGLE: I thought you had to be
3  somewhere. We'll put you back over here and let
4  you testify some more.
5       THE WITNESS: The last day of August was
6  pretty hectic for us for a while. I'm kind of
7  lost sometimes.
8  BY MR. PRINGLE:
9     Q.  So I take it that you didn't see the
10 previous six reports that were submitted either?
11    A.  No, sir.
12    Q.  I show you Exhibit 4. Were you aware that
13 this council, the Harrison County Criminal Justice
14 Coordinating Council, existed?
15    A.  I did not remember that until today. But I
16 do remember, now that I think about it, some of the
17 issues that Mr. Martin did bring to the Board. He
18 said, I'm on this committee. That's kind of the way
19 he explained it. I'm on this committee and we need to
20 do this and this, so we talked about those things.
21 But I did not -- wasn't aware really that it was -- I
22 didn't remember the name of it or anything like that.
23    Q.  You never participated in it?
24    A.  No, sir, I wasn't asked.
25    Q.  What issues did Mr. Martin bring to the

PAGE 15

15

1  Board concerning the committee?
2     A.  The public defenders office, the
3  overcrowding and how we might address that, and
4  personnel issues. But that was basically an
5  every-meeting issue, especially after '05 -- I mean
6  '06. I'm sorry, '06.
7     Q.  Have you had an opportunity to meet with Mr.
8  Cabana in Board meetings, executive session, or
9  otherwise concerning the changes he's made at the
10 jail?
11    A.  We met with Mr. Cabana and a group that were
12 looking at privatizing the jail and we took a short
13 tour and he had -- I asked where the chair was. I
14 said, Where's this chair I keep hearing so much
15 about? He said, It's over there. They took me into a
16 back room and it was disassembled. I said, Okay.
17    Q.  Did Mr. Cabana report to you that it's no
18 longer used at the jail?
19    A.  Yes, sir. And then we had some executive
20 session meetings concerning personnel and the locking
21 system and security cameras, but that has been
22 recently. I was not president at the time.
23       MR. PRINGLE: That's all the questions I
24    have.
25                --- ---

PAGE 16

16

1                 EXAMINATION
2  BY MS. YOUNG:
3     Q.  I have one, Connie, just to clear up the
4  record. Prior to the newspaper articles and the
5  publicity about the Jessie Lee Williams incident or
6  this case, were you aware of inmate abuse at the
7  Harrison County jail?
8     A.  No, ma'am. I had -- there was some hearsay
9  and that is when this Board was so adamant about
10 questioning and trying to find out exactly what was
11 going on at the jail to no avail.
12    Q.  You had no knowledge of any particular
13 jailers that were abusing inmates or anything like
14 that, did you?
15    A.  No.
16    Q.  And prior to the publicity in the newspapers
17 or TV, whatever, about this particular incident and
18 that chair, had you ever heard of a prisoner being
19 injured as a result of being in that chair at the
20 Harrison County jail?
21    A.  No.
22       MS. YOUNG: Thank you. I have no more
23    questions.
24       MR. PRINGLE: Thank you.
25                --- ---

PAGE 17 SHEET 5

```
                                                              17
 1                    (Witness excused.)
 2         (The deposition was concluded at 2:45 p.m.)
 3                            - - -
```

PAGE 18

```
                                                              18
 1                        CERTIFICATE
 2    STATE OF MISSISSIPPI
 3    COUNTY OF HARRISON
 4         I, Lisa Hood Brown, Freelance Court Reporter
 5    and Notary Public, duly commissioned for the County
 6    of Harrison, State of Mississippi, do hereby certify:
 7         That on the 12th day of March, 2008, there
 8    appeared before me CONNIE ROCKO, who was sworn and
 9    examined to tell the truth, and that the preceding
10    seventeen (17) typewritten pages contain a full, true
11    and correct copy of my stenotype notes and/or
12    electronic tape recording of the testimony of CONNIE
13    ROCKO.
14         That the witness has chosen to reserve
15    reading and signing of the deposition.
16         That I am not related to or in anywise
17    associated with any of the parties to this cause of
18    action, or their counsel, and that I am not
19    financially interested in the same;
20         IN WITNESS WHEREOF, I have hereunto set my
21    hand, this 31st day of March, 2008.
22
23
24    _____
      Lisa Hood Brown, CSR No. 1166
25    Notary Public, State of Mississippi,
      County of Harrison. My commission
      expires 2-5-10.
```

PAGE 19

```
                                                              19
 1                 E R R A T A   S H E E T
 2    STATE OF MISSISSIPPI
 3    COUNTY OF _____
 4         I, CONNIE ROCKO, the undersigned Deponent,
 5    having read the foregoing deposition, pages numbered 4
 6    through 17, find the same to be a true and correct
 7    transcription of the proceedings taken at the time and
 8    place indicated therein, except as follows, (if any):
 9    PAGE   LINE   WHERE IT READS:        SHOULD READ:
10    ___    ___    _____        _____
11    ___    ___    _____        _____
12    ___    ___    _____        _____
13    ___    ___    _____        _____
14    ___    ___    _____        _____
15    ___    ___    _____        _____
16    ___    ___    _____        _____
17    ___    ___    _____        _____
18    ___    ___    _____        _____
19
20                          _____
                                 CONNIE ROCKO
21    Sworn to and subscribed
      by me, this ____ day of
22    _____, A.D., 2008.
23    _____
      Notary Public, State of Mississippi,
24    County of _____.
      My commission expires:
25
```