## PAGE 1 SHEET 1

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 3                     SOUTHERN DIVISION
 4
 5   KASEY D. ALVES,
 6          Plaintiff,
 7   VS.                    CAUSE NO.: 1:06cv912 LG-JMR
 8   HARRISON COUNTY MISSISSIPPI, BY AND
     THROUGH THE BOARD OF SUPERVISORS;
 9   HARRISON COUNTY SHERIFF'S DEPARTMENT;
     SHERIFF GEORGE PAYNE, JR.; AND,
10   HEALTH ASSURANCE, LLC.,
11          Defendants.
12
13                        DEPOSITION
14                            OF
15                       MARLIN LADNER
16            Taken on behalf of the Plaintiff
17        11:33 a.m., Wednesday, March 12th, 2008
18                          before
19              Lisa H. Brown, CSR #1166
20
21
22
23                  COAST-WIDE REPORTERS
                        Court Reporters
24                   Post Office Box 95
                Biloxi, Mississippi 39533-0095
25                     (228) 374-5066
```

## PAGE 2

```
 1          The deposition of MARLIN LADNER, taken on the
 2   12th day of March, 2008, commencing at 11:33 a.m., at
 3   the offices of the Harrison County Board of
 4   Supervisors, 1831 23rd Avenue, in the City of
 5   Gulfport, County of Harrison, State of Mississippi,
 6   before Lisa Hood Brown, CSR, Freelance Court Reporter
 7   and Notary Public within and for the County of
 8   Harrison, State of Mississippi.
 9
10   APPEARANCES:
11          WOODROW W. PRINGLE, III, ESQUIRE
            2217 Pass Road
12          Gulfport, Mississippi  39501
            Appearing on behalf of the Plaintiff.
13
            JON S. TINER, ESQUIRE
14          Dukes, Dukes, Keating & Faneca
            2909 - 13th Street, Sixth Floor
15          Gulfport, Mississippi  39501
            Appearing on behalf of the Defendant,
16              Sheriff George Payne, Jr.
17          JOSEPH MEADOWS, ESQUIRE
            KAREN J. YOUNG, ESQUIRE
18          Meadows Law Firm
            Post Office Drawer 1076
19          Gulfport, Mississippi 39502
            Appearing on behalf of the Defendant,
20              Harrison County Board of Supervisors.
21          ROBERT H. PEDERSEN, ESQUIRE
            Watkins & Eager
22          400 East Capitol Street
            Jackson, Mississippi  39205
23          Appearing on behalf of the Defendant, Heath
                Assurance, LLC.
24
25   ALSO PRESENT:  Connie Rocko
```

## PAGE 3

```
                                                        3
 1                       I N D E X
 2
 3   MARLIN LADNER:                            PAGE:
 4       EXAMINATION
 5          By Mr. Pringle ---------------- 4
 6                        - - -
 7                     E X H I B I T S
 8                        - - -
 9       REPORTER'S CERTIFICATE ------- 25
10                        - - -
11       ERRATA SHEET ----------------- 26
12                        - - -
```

**EXHIBIT C** (tabbies)

## PAGE 4

```
                                                         4
 1                   MARLIN LADNER,
 2   having been produced and first duly sworn, was examined
 3   and testified as follows:
 4                        - - -
 5                     EXAMINATION
 6   BY MR. PRINGLE:
 7       Q.  Please state your name.
 8       A.  Marlin Ladner.
 9       Q.  Mr. Ladner, you are currently a member of the
10   Harrison County Board of Supervisors?
11       A.  Yes.
12       Q.  For what years did you serve as a member of
13   the Board?
14       A.  From 2000 to the present.
15       Q.  And during your service as a member of the
16   Board, what is the Board's role in the management or
17   the operation of the Harrison County Adult Detention
18   Center?
19       A.  The responsibility of the Board is to provide
20   a budget for the operation of the detention center.
21       Q.  Does the Board have any other role in the
22   management of the detention center?
23       A.  No, sir.
24       Q.  I show you Exhibit 1, which is a January 12,
25   1995 Consent Judgment entered in United States District
```

PAGE 5 SHEET 2

5

1  Court, and ask you to take a look at that.
2     A.  Yes, sir.
3     Q.  Have you ever seen it?
4     A.  Yes, sir.
5     Q.  Have you had a chance to read it?
6     A.  I have.
7     Q.  What steps does the Board take to ensure
8  compliance with this Judgment?
9     A.  The steps that the Board takes is to provide
10 funding to meet any fiduciary needs to comply with that
11 Judgment.
12    Q.  And how does the Board monitor compliance
13 with the Judgment?
14    A.  Well, we've asked on several occasions.  I
15 think if you review the minutes, you can see where
16 we've asked specifically in reference to the number of
17 Jail guards that have been hired.  We have also
18 provided appropriations, budgetary appropriations, to
19 hire the required number of Jail guards.
20    Q.  Does Harrison County have any other
21 responsibility under this Consent Judgment, other than
22 to provide funds for staffing at the Jail?
23    A.  I don't know what other responsibilities,
24 other than to expect the sheriff to accomplish and to
25 provide those requirements.

PAGE 6

6

1     Q.  Look at page sixteen of the Judgment.
2     A.  Okay.
3     Q.  Paragraph forty, do you see that?
4     A.  Yes, sir.
5     Q.  Have you ever had an opportunity to review
6  these status reports that are submitted to the court?
7     A.  We have asked on occasions to -- specifically
8  in reference to the number of guards that have been
9  hired.
10    Q.  So have you had a chance to look at the
11 reports?
12    A.  We had difficulty in getting them.  I think
13 we have had at one time, and the information that we've
14 gotten is the difficulty in -- from the sheriff was the
15 hiring and maintaining those folks.
16    Q.  Okay.  And I don't mean to keep repeating,
17 but I don't know if you've answered my question yet.
18 Have you had a chance to read any of those quarterly
19 reports?
20    A.  I don't recall seeing or reading those
21 quarterly reports.
22    Q.  Okay.  Thank you.
23        THE WITNESS:  Pardon me?  Yeah.
24 BY MR. PRINGLE:
25    Q.  What are you looking at?

PAGE 7

7

1     A.  I'm looking at the minutes from the Board of
2  Supervisor's meeting, dated 8/2nd/2004.
3     Q.  What does that minute entry say?
4     A.  Pardon me?
5     Q.  What does that minute entry say that you're
6  looking at?
7     A.  "Supervisor Martin inquired about monthly
8  report from the sheriff's department on training of
9  new jailers.  Mr. Robert Parker stated that it takes a
10 few days after the first of the month to generate this
11 report.  It should be available at the next Board
12 meeting."
13        MR. TINER:  What date was that?  I'm sorry.
14        THE WITNESS:  I'm sorry.  It's on
15 8/2nd/2004.
16 BY MR. PRINGLE:
17    Q.  But as a member of the Board, you don't ever
18 remember seeing one of those reports?
19    A.  I can't recall.  I can't recall that I did or
20 didn't.  I'm sure I did, but I don't recall exactly
21 what the reports were, no, sir.
22    Q.  Okay.  I show you Exhibit 2.  If you can
23 hand me Exhibit 1, please.
24    A.  Okay.
25        (Also present person back.)

PAGE 8

8

1  BY MR. PRINGLE:
2     Q.  Prior to today, have you seen that report?
3     A.  I don't recall.  I cannot recall.  There's so
4  much information going.  I don't recall if I have or
5  have not.
6     Q.  Do you know a man by the name of John Alese,
7  A-L-E-S-E?
8     A.  No, sir.
9     Q.  So you don't recall whether or not you ever
10 saw this report?
11    A.  I cannot recall.  I do not recall seeing
12 that.
13    Q.  Okay.  Just look at a few of the pages to see
14 if it helps refresh your memory.
15        Turn to page two, the second paragraph.
16 "Detention staff does not uniformly receive pre-service
17 training and annual in-service programs are not
18 regularly provided.  The majority of training is
19 currently on-the-job."
20        Do you ever remember reading that finding?
21    A.  No, sir.
22    Q.  Last paragraph, page two.  "The morale of the
23 staff is extremely low.  Staff claimed they are
24 overworked."
25        Do you ever remember reading that finding?

PAGE 9  SHEET 3

9

1   A.   I don't remember reading it, but I do recall
2  in conversations that being talked about.
3   Q.   And who do you remember having conversations
4  with?
5   A.   I'm talking about in general meetings with
6  the -- you know, jail house meetings.
7   Q.   In the Board meetings?
8   A.   Yeah, because we talked about, of course,
9  giving pay raises to the corrections officers, and
10 much of the discussion was about the corrections
11 officers and their morale. And that's why we
12 instituted pay raises for them.
13  Q.   Go to page three. Don Cabana, at some point,
14 became warden of the Harrison County Jail. Do you
15 recall that?
16  A.   Yes, sir.
17  Q.   And after Dr. Cabana because the warden, did
18 he begin appearing at the Board meetings?
19  A.   Yes, sir.
20  Q.   And were there times that you had executive
21 sessions with Dr. Cabana?
22  A.   Yes, sir.
23  Q.   Do you recall what was discussed with
24 Dr. Cabana during those executive sessions?
25  A.   We were discussing the conditions of the

PAGE 10

10

1  jail, primarily the locking system, but other
2  conditions, as well, for example, security, et cetera.
3   Q.   Okay.
4   A.   And --
5   Q.   Go ahead. I'm sorry.
6   A.   The general condition of the jail, as well as
7  specifically the locking facility.
8   Q.   Do you remember having any discussions with
9  Dr. Cabana concerning alleged violence in the booking
10 area?
11  A.   Other than general -- no. General
12 discussions about what had occurred.
13  Q.   Do you recall any specifics of what he told
14 you had occurred?
15  A.   Not any specifics, other than that, you know,
16 it had occurred.
17  Q.   Page three. The middle of the page -- of
18 the first paragraph. It says, "Dr. Cabana stated that
19 there were approximately fifty-seven staff
20 vacancies."
21      Do you see that?
22  A.   On page three?
23  Q.   Yes, sir, on page three, the first paragraph.
24  A.   Oh, I'm sorry. I was looking at the middle.
25 Oh. Yes, I see that.

PAGE 11

11

1   Q.   Do you remember Dr. Cabana reporting that?
2   A.   Yes.
3   Q.   And has any action been taken to alleviate
4  that problem?
5   A.   There were some discussions about -- I think
6  they went on TV to, you know, advertise jail vacancies,
7  correctional officer vacancies. We talked about that,
8  trying to get personnel.
9   Q.   The bottom of the page, page three. It
10 says, "Due to inadequate staffing levels,
11 poorly-trained staff, limited supervision, crowded
12 conditions, failure to follow established policy and
13 procedures, inadequate classification options and an
14 intake/release process that is inefficient and
15 ineffective, the Harrison County Adult Detention
16 Center is neither safe nor is it secure."
17      Do you remember that finding?
18  A.   I do know that those issues were discussed,
19 yes.
20  Q.   They were discussed by the Board, or who did
21 you discuss it with?
22  A.   Well, it was discussed on ongoing occasions
23 as far as referencing the number of people available at
24 the jail to provide, you know, oversight, correctional
25 oversight, and the difficulties there were to hire and

PAGE 12

12

1  keep those folks.
2   Q.   Page four, about the third paragraph down,
3  it says, dash, and then it says, "Staff should be held
4  accountable." Do you see that?
5   A.   Yes, sir.
6   Q.   And go to the last sentence of that
7  paragraph. "According to staff and Dr. Cabana, there
8  has been a pattern of allowing personnel to resign in
9  lieu of disciplinary action being taken."
10      Were you aware of that finding?
11  A.   No, I wasn't.
12  Q.   Have you had any discussions with Dr. Cabana
13 about that?
14  A.   Not in reference to "in lieu of disciplinary
15 action being taken." The only thing that I recall is
16 that we were having difficulty getting and maintaining
17 corrections officers.
18  Q.   Did Dr. Cabana tell you why it was difficult
19 to retain corrections officers?
20  A.   Well, in general, the pay was part of it;
21 the working conditions were part of it; just a
22 difficult situation in getting those folks.
23  Q.   Go to page six, the last paragraph. It says,
24 "Dr. Cabana has instituted numerous changes in the
25 booking area."

PAGE 13  SHEET 4

13

1      Do you see that?
2   A.   Yes, sir.
3   Q.   Did Dr. Cabana ever tell you what those
4  changes have been?
5   A.   I specifically recall that, of course, the
6  chair that was used -- what did they call it?
7       MR. MEADOWS:  Restraint.
8   A.   Restraint chair.  I know he disbanded the use
9  of the restraint chair.  He indicated that to us.
10  BY MR. PRINGLE:
11  Q.   Do you recall any others, any other
12  specifics?
13  A.   I can't recall any other specifics.
14  Q.   Do you keep any independent notes of what
15  happens during Board meetings or executive sessions?
16  A.   No, sir.
17  Q.   Look at page eight.  It's actually paragraph
18  -- it's numbered paragraph one at the top.  Do you see
19  that?
20  A.   Yes, sir.
21  Q.   It says, "An overall concern by Captain
22  Rodgers that, overall, policy and procedures were not
23  being adhered to in the intake area."  Were you aware
24  of that?
25  A.   No, sir.

PAGE 14

14

1   Q.   Have you ever met with Captain Rodgers?
2   A.   Never have.
3   Q.   Do you know who he is?
4   A.   No, sir.
5   Q.   Do you know what his job is at the jail?
6   A.   No, sir, I do not know Captain Rodgers or am
7  I familiar with his job requirements.
8   Q.   All right.  Hand me that one, and I'll hand
9  you Exhibit 3.
10  A.   Okay.
11  Q.   That purports to be a report by Steve Martin
12  prepared for the U.S. Department of Justice, dated
13  February 1, 2005.  Do you recall ever seeing that
14  report?
15  A.   Again, I can't say yes or no.  I don't
16  recall.  I possibly could have.
17  Q.   Let's just look at parts of it and see if you
18  recall any of it.  Go to page one.
19  A.   Okay.
20  Q.   Look at the top, the first paragraph, the
21  second sentence.  "The six previous reports have
22  detailed numerous, serious and persistent problems
23  related to overcrowding, staffing and security."
24       Do you see that?
25  A.   Yes, sir.

PAGE 15

15

1   Q.   Do you recall seeing any of those previous
2  six reports?
3   A.   I don't recall the reports, but I do know we
4  were having difficulties -- that we were informed that
5  there were difficulties with staffing at the jail.  And
6  that's why we specifically appropriated the funds to
7  make sure that we meet that number.  As far as, you
8  know, actually seeing the report, I don't recall.
9   Q.   You don't recall specifically seeing this
10  report, either?
11  A.   No, sir.  This was -- no, sir, I don't.
12  Q.   Go to page seven.  In the middle of the page
13  there's a number one.  It says, Staff Use of Force."
14  Do you see that?
15  A.   Right.  Yes.
16  Q.   The second sentence.  "As aforementioned,
17  there were thirty-one incidents of force in December
18  2004, which represents a serious increase in the use of
19  force at the HCDC.  In reviewing the use of force
20  incident packages for November/December 2004, a very
21  disturbing pattern of misuse of force is evident."
22       Do you remember seeing that?
23  A.   No, sir.
24  Q.   Do you remember anybody reporting this
25  information to you?

PAGE 16

16

1   A.   The only thing that I recall is that, on
2  occasions, we would receive -- I would receive, as an
3  individual Board member, copies of complaints made by
4  various inmates at the jail.  And the general rule was
5  to first relay it to Mr. Meadows, those things, and
6  make sure that he had copies, as well as the district
7  attorney.  I know we had one specific Board member that
8  would -- I knew was relaying those copies to the
9  district attorney.
10  Q.   And who would give you copies of the
11  complaints?
12  A.   They would come through the mail.
13  Q.   The mail?
14  A.   I presume so, the mail.
15  Q.   And once you got copies of those complaints,
16  you would give them to -- you would give a copy to
17  Mr. Meadows and a copy to the DA?
18  A.   I would make sure that a copy -- they would
19  usually indicate on there where those copies went to.
20  And then I know that one specific Board member, in
21  talking about those things, was sending that to the
22  district attorney, yes, sir, seeing that he got those
23  reports.
24  Q.   Who was that Board member?
25  A.   Connie Rockco.

PAGE 17  SHEET 5

17

1  Q.  And what did you do with your copy of the
2  complaints that you received?
3  A.  I probably, to be honest with you, tossed
4  them away, once I knew that they were with the
5  appropriate personnel.
6  Q.  While you've been on the Board, has there
7  been any discussions about privatizing the Jail?
8  A.  Yes, sir.
9  Q.  You came on to the Board in the calendar year
10 2000?
11 A.  Yes, sir, January 2000.
12 Q.  And since 2000, when is the first time that
13 you recall having any discussions about privatizing the
14 Jail?
15 A.  Oh, Lord.  I can't remember any specific
16 dates, but I do know that it really became an issue
17 after the death of Mr. Williams, and there could have
18 been previous discussions of that.  I do not recall any
19 specific dates.
20 Q.  But as far as seeking legislation to try to
21 privatize the Jail, the first time would have been
22 after Mr. Williams' death?
23 A.  I believe so, yes, sir.
24 Q.  It's my understanding that the sheriff would
25 not agree to it; is that correct?

PAGE 18

18

1  A.  That's -- yes.
2  Q.  Do you know why he wouldn't agree?
3  A.  I have no idea and I've never talked to him
4  about it, ever.
5  Q.  Were you given any information as to why he
6  wouldn't agree?
7  A.  No, sir.
8  Q.  Since you've served on the Board since 2000,
9  has Sheriff Payne ever appeared before the Board?
10 A.  Yes, he has.
11 Q.  Have you had a chance to ever talk to
12 Sheriff Payne in executive session?
13 A.  Gosh, I don't recall.  I do know -- I do
14 recall him appearing before the Board, if my
15 recollection serves me correctly, three times.
16     MR. MEADOWS:  Over what period?
17 A.  Over the period of eight years that I've been
18 on the Board.  And I do think we did have an executive
19 session at one of those times.
20 BY MR. PRINGLE:
21 Q.  Do you recall what the --
22 A.  I basically recall it being in reference to
23 Jail certification, if I'm correct -- if I recall
24 correctly.
25 Q.  Did the Board ever request that the sheriff

PAGE 19

19

1  appear before the Board?
2  A.  Yes.
3  Q.  And did the sheriff ever appear when he was
4  requested to come before the Board?
5  A.  No, sir, that I recall.
6  Q.  Were there any specific issues that the Board
7  wished to discuss with the sheriff?
8  A.  Well, primarily budget issues and -- that was
9  basically our responsibility, so we were wanting to
10 talk to him in reference to the budget and needs of the
11 sheriff's department overall.
12 Q.  Was there ever any one particular individual
13 that the sheriff would rely on to come before the
14 Board?
15 A.  We primarily dealt with Robert Parker.
16 Q.  Look on page eight and nine of that exhibit.
17 These are specific instances of alleged use of force on
18 inmates at the Jail.  Do you recall ever reviewing
19 these incidents?
20 A.  I do not recall in this report.  However,
21 like I said, I recall incidents of coming before us,
22 either through the mail, and I do know on one occasion
23 we had some folks who complained that came directly to
24 a Board meeting.
25 Q.  Do you happen to recall what their complaints

PAGE 20

20

1  were, the individuals who appeared before the Board?
2  A.  The gentleman that came before the Board was
3  complaining about the treatment of his wife.
4  Q.  Do you recall his last name being Wynn,
5  W-Y-N-N?
6  A.  Yes, sir.
7  Q.  And do you recall what, if any, response the
8  Board made after hearing that complaint?
9  A.  After hearing that complaint, we also heard
10 from the sheriff's department, the internal affairs
11 officer, who reported his version of the incident and
12 what his investigation revealed.
13 Q.  Do you know who the officer was?
14 A.  Campbell, I believe.  Officer Campbell.
15 Q.  Steve Campbell?
16 A.  Steve Campbell.
17 Q.  After hearing from Mr. Campbell, what, if
18 anything, did the Board do after that?
19 A.  The Board took no action other than to ask
20 the sheriff's department to investigate it and look
21 into it.
22 Q.  I'll swap exhibits with you and show you
23 Exhibit 4.
24 A.  Okay.
25 Q.  Do you know what the Harrison County Criminal

PAGE 21  SHEET 6

21

1  Justice Coordinating Council is?
2     A.  No, I don't. I can't say I do. I know that
3  the sheriff did create an advisory council, and I
4  don't know if that's it or not.
5     Q.  The advisory council that was -- whether it
6  was this one or another one, do you know why that one
7  was created?
8     A.  My understanding was simply to be an advisory
9  Board, I presume. I never was involved in it, and I do
10 not know exactly what their mission was.
11    Q.  So you never attended their meetings or had
12 any knowledge concerning what they did?
13    A.  No, sir.
14    Q.  Whether it was this council or another
15 advisory committee; right?
16    A.  Yeah. I'm not sure this is exactly what that
17 particular council that I'm aware of is called.
18    Q.  And you have no personal knowledge about the
19 Harrison County Criminal Justice Coordinating Council?
20    A.  No, sir.
21    Q.  Do you recall seeing a July 20, 2005 letter
22 from the Department of Justice concerning conditions at
23 the jail? Specifically, it was complaining about
24 instances of misuse of force and health and safety
25 issues at the jail. Do you recall that letter?

PAGE 22

22

1     A.  I don't recall the specific letter. I do
2  recall some of the issues, and I think there was some
3  fire safety issues. If I recall correctly, we got some
4  information on that.
5     Q.  Do you recall that letter setting forth that
6  there were issues about misuse of force at the jail?
7     A.  I don't recall that specifically, no, sir.
8     Q.  And do you recall that that letter also said
9  there were instances of misuse of force not being
10 reviewed and investigated?
11    A.  No, I do not recall that.
12    Q.  Are you aware that the sheriff's department
13 holds Civil Service or administrative hearings
14 concerning misconduct of -- alleged misconduct of
15 officers at the jail?
16    A.  Yes, sir. I'm aware of the Civil Service
17 applicable to the sheriff's department.
18    Q.  Have you had an opportunity to review any of
19 the findings of the Civil Service Commission concerning
20 alleged conduct --
21    A.  No, sir, I have not.
22    Q.  Are you aware that there is an inmate
23 grievance procedure that can be followed for inmates to
24 file grievances concerning their treatment at the jail?
25    A.  I am aware of that -- a procedure, yes, sir.

PAGE 23

23

1     Q.  Have you ever reviewed any of the inmate
2  grievances?
3     A.  I have not reviewed any of the in- -- well, I
4  can't say. I think some of that information -- that's
5  what I'm talking about, these letters coming to me that
6  somebody would complain and I'd read those complaints.
7     Q.  Let me rephrase the question. Other than the
8  letters you received in the mail, have you reviewed any
9  of the inmate grievances?
10    A.  No, sir. No, sir.
11    Q.  Have you ever reviewed the sheriff's
12 department policies and procedures?
13    A.  No, sir.
14    Q.  Ever reviewed the sheriff's department
15 general orders?
16    A.  No, sir.
17    Q.  Do you know what training the sheriff uses to
18 train correctional officers at the jail?
19    A.  No. I'm not specifically aware of the
20 specific training, other than that they've received
21 training.
22    Q.  But you have no knowledge of what the
23 training is?
24    A.  No, sir.
25    Q.  Are you aware that the jail has a system to

PAGE 24

24

1  video record the activities in the booking area?
2     A.  Yes, sir.
3     Q.  Have you ever had an opportunity to review
4  any of those videos?
5     A.  No, sir, other than the video in reference to
6  Williams later on. Much later on.
7     Q.  So the incident concerning Jessie Williams is
8  the only video you've ever reviewed from the booking
9  area?
10    A.  That's correct.
11    Q.  Have you requested an opportunity to review
12 any of the other videos?
13    A.  No, sir.
14        MR. PRINGLE:  That's all I have. Thank you,
15    sir.
16                    - - -
17              (Witness excused.)
18    (The deposition was concluded at 12:01 p.m.)
19                    - - -

PAGE 25  SHEET 7

25

1                        CERTIFICATE
2   STATE OF MISSISSIPPI
3   COUNTY OF HARRISON
4        I, Lisa Hood Brown, Freelance Court Reporter
5   and Notary Public, duly commissioned for the County
6   of Harrison, State of Mississippi, do hereby certify:
7        That on the 12th day of March, 2008, there
8   appeared before me MARLIN LADNER, who was sworn and
9   examined to tell the truth, and that the preceding
10  twenty-four (24) typewritten pages contain a full,
11  true and correct copy of my stenotype notes and/or
12  electronic tape recording of the testimony of MARLIN
13  LADNER.
14       That the witness has chosen to reserve
15  reading and signing of the deposition.
16       That I am not related to or in anywise
17  associated with any of the parties to this cause of
18  action, or their counsel, and that I am not
19  financially interested in the same;
20       IN WITNESS WHEREOF, I have hereunto set my
21  hand, this 31st day of March, 2008.
22
23
24            Lisa Hood Brown, CSR No. 1166
              Notary Public, State of Mississippi,
25            County of Harrison. My commission
              expires 2-5-10.

PAGE 26

26

1                      E R R A T A   S H E E T
2   STATE OF MISSISSIPPI
3   COUNTY OF _____
4        I, MARLIN LADNER, the undersigned Deponent,
5   having read the foregoing deposition, pages numbered 4
6   through 24, find the same to be a true and correct
7   transcription of the proceedings taken at the time and
8   place indicated therein, except as follows, (if any):
9   PAGE   LINE    WHERE IT READS:         SHOULD READ:
10  ___    ___    _____    _____
11  ___    ___    _____    _____
12  ___    ___    _____    _____
13  ___    ___    _____    _____
14  ___    ___    _____    _____
15  ___    ___    _____    _____
16  ___    ___    _____    _____
17  ___    ___    _____    _____
18  ___    ___    _____    _____
19
20                            _____
                                   MARLIN LADNER
21  Sworn to and subscribed
    by me, this ____ day of
22  _____, A.D., 2008.
23
    Notary Public, State of Mississippi,
24  County of _____.
    My commission expires:
25