## PAGE 1 SHEET 1

```
                UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                      SOUTHERN DIVISION


KASEY D. ALVES,

        Plaintiff,

   VS.                    CAUSE NO.: 1:06cv912 LG-JMR

HARRISON COUNTY MISSISSIPPI, BY AND
THROUGH THE BOARD OF SUPERVISORS;
HARRISON COUNTY SHERIFF'S DEPARTMENT;
SHERIFF GEORGE PAYNE, JR.; AND
HEALTH ASSURANCE, LLC.,

        Defendants.


                        DEPOSITION
                            OF
                     GEORGE PAYNE, JR.
              Taken on behalf of the Plaintiff
            9:30 a.m., Tuesday, February 12th, 2008
                          before
                   Lisa H. Brown, CSR #1166




                    COAST-WIDE REPORTERS
                       Court Reporters
                     Post Office Box 95
                 Biloxi, Mississippi  39533-0095
                        (228) 374-5066
```

## PAGE 2

```
                                                            2

 1        The deposition of GEORGE PAYNE, JR., taken on
 2   the 12th day of February, 2008, commencing at 9:30
 3   a.m., at the offices of Dukes, Dukes, Keating &
 4   Faneca, 2909 13th Street, Sixth Floor, in the City of
 5   Gulfport, County of Harrison, State of Mississippi,
 6   before Lisa Hood Brown, CSR, Freelance Court Reporter
 7   and Notary Public within and for the County of
 8   Harrison, State of Mississippi.

10   APPEARANCES:

11        WOODROW W. PRINGLE, III, ESQUIRE
          2217 Pass Road
12        Gulfport, Mississippi  39501
          Appearing on behalf of the Plaintiff.
13
14        JON S. TINER, ESQUIRE
          HALEY N. BROOM, ESQUIRE
15        Dukes, Dukes, Keating & Faneca
          2909 13th Street, Sixth Floor
16        Gulfport, Mississippi  39501
          Appearing on behalf of the Defendant,
17             Sheriff George Payne, Jr.

19        KAREN J. YOUNG, ESQUIRE
          Meadows Law Firm
20        Post Office Drawer 1076
          Gulfport, Mississippi  39502
21        Appearing on behalf of the Defendant,
               Harrison County Board of Supervisors.

23        ROBERT H. PEDERSEN, ESQUIRE
          Watkins & Eager
24        400 East Capitol Street
          Jackson, Mississippi  39205
25        Appearing on behalf of the Defendant, Heath
               Assurance, LLC.
```

## PAGE 3

```
                                                            3

 1                     I N D E X

 3   GEORGE PAYNE, JR.:                              PAGE:
 4        EXAMINATION
 5             By Mr. Pringle --------------- 4
 6             By Ms. Young ---------------- 30
 7             By Mr. Pringle --------------- 41

 9                     E X H I B I T S
10        No. 1 ------------------- 4
11        No. 2 ------------------- 40

13        REPORTER'S CERTIFICATE ------- 45

15        ERRATA SHEET ---------------- 46
```

## PAGE 4

```
                                                            4

 1                          - - -
 2             (Whereupon, Exhibit 1 was marked.)
 3                          - - -
 4                     GEORGE PAYNE, JR.,
 5   having been produced and first duly sworn, was
 6   examined and testified as follows:
 7                          - - -
 8                       EXAMINATION
 9   BY MR. PRINGLE:
10        Q.   Please state your name.
11        A.   George H. Payne.
12        Q.   Your current occupation?
13        A.   Retired.
14        Q.   When did you retire?
15        A.   January of this year.
16        Q.   What was your occupation before you retired?
17        A.   Sheriff of Harrison County.
18        Q.   And for what period of time did you serve as
19   sheriff?
20        A.   Eight years.  January 2000, I believe, is
21   when I started.
22        Q.   January 2000 is when you took the first
23   office?
24        A.   First took office.
25        Q.   And you served in that office through
```

EXHIBIT D

PAGE 29  SHEET 8

29

1  question, Woody? I didn't understand it.
2      MR. PRINGLE: I said, Was he aware the ACA
3  recently removed their accreditation of the jail?
4      A. Somebody told me that. I've not seen
5  anything in reference to it.
6  BY MR. PRINGLE:
7      Q. Let me get this straight. The ACA, in the
8  eight years that you were the Sheriff, sent teams to
9  the jail on two occasions?
10     A. Two occasions.
11     Q. And on each of those occasions, they would
12 have stayed there two or three days?
13     A. Correct.
14     MR. PRINGLE: That's all the questions I
15 have. Thank you.
16     MR. TINER: Give us a just a second, if you
17 would.
18     MR. PRINGLE: Sure.
19          - - -
20        (Off the record.)
21          - - -
22     MR. TINER: We're not going to have
23 anything.
24     MS. YOUNG: I have a few.
25          - - -

PAGE 30

30

1              EXAMINATION
2  BY MS. YOUNG:
3      Q. You mentioned this incident was investigated
4  by the Justice Department, and you've indicated that
5  one of their civil rights attorneys said that Mr.
6  Alves said he was pleased with his treatment at the
7  jail?
8      A. No, I didn't say civil rights attorneys. I
9  said FBI agent.
10     Q. FBI agent. So that female attorney with the
11 FBI said that Mr. Alves --
12     A. Agent.
13     Q. -- said he was pleased -- Mr. Alves was
14 pleased with his treatment at the jail?
15     A. I'll never forget it. Best civil rights
16 interview I've ever done. He was well treated, had no
17 problems, et cetera, et cetera. I'll never forget
18 that. Just bumping into in the hallway, she brings
19 that point up to me.
20     Q. So was there any violations claimed by the
21 FBI or Justice Department as a result of that
22 incident?
23     A. None that I'm aware of.
24     Q. So, the FBI and the Justice Department both
25 found that there was no unjustifiable use of force or

PAGE 31

31

1  any abuse to Mr. Alves?
2      MR. PRINGLE: Object to the form.
3      A. I've seen no final reports on it. Their
4  process is, the Bureau will come in and do an
5  investigation. And they would put it together and
6  ship it to main Justice, and then main Justice would
7  let them know or us if there they were going to do
8  anything with it.
9  BY MS. YOUNG:
10     Q. I got you.
11     A. I've only had one of those, and that was
12 Williams, that I can remember until all this started.
13     Q. All right. So to the best of your
14 knowledge, there has been no report issued by the
15 Justice Department or the FBI regarding the Alves
16 incident?
17     MR. PRINGLE: Object to the form.
18 BY MS. YOUNG:
19     Q. Is that correct?
20     A. None that I've seen. I'm sure there's a
21 report.
22     Q. But you're not aware of any negative report
23 like you got from the Williams case?
24     A. I'm not familiar with any of it. I have not
25 seen any of it.

PAGE 32

32

1      Q. But you did know that there was -- like
2  you're telling me of all the years -- the eight years
3  you've been involved as Sheriff with Harrison County,
4  there was only one incident where you received a
5  negative report from the Justice Department?
6      A. That's correct.
7      Q. And that was the Williams case?
8      A. That's correct. It kind of went downhill
9  from there.
10     Q. Yes, sir. Did it take them long to issue
11 that negative report in the Williams case from the
12 time of the incident?
13     A. I think it's still going on, but I'm not
14 sure.
15     Q. Is it fair that if you -- do you feel like
16 if there was going to be a negative report issued
17 regarding the Alves case you would have heard about it
18 by now?
19     A. I think so. That's fair.
20     Q. Now, you were asked earlier about the
21 policies and procedures of, you know, your department.
22     A. Uh-huh (indicating yes).
23     Q. And I believe your testimony is the Board of
24 Supervisors weren't provided with policies and
25 procedures regarding the day-to-day activities of your

PAGE 33 SHEET 9

33

1 office; is that correct?
2     MR. PRINGLE: Object to the form.
3     A. No.
4 BY MR. PRINGLE:
5     Q. Let me ask you this. I've got in my hand
6 your weapons and use of force policies and
7 procedures. Now this is not a policy that you
8 presented to the Board. It's General Order Number 10
9 dated January 3rd, 2000. You did not present this to
10 the Board and ask them for approval of this policy,
11 did you?
12     A. I don't believe.
13     Q. Okay. And that is because that your
14 policies and procedures regarding how you operate the
15 jail on a daily basis do not have to be approved by
16 the Board of Supervisors, do they?
17     A. They don't have to be approved. I think
18 they were reviewed, but I don't think they had to be
19 approved.
20     Q. To the best of your knowledge, though, they
21 weren't spread on the Board minutes and accepted as a
22 policy and procedure of Harrison County, were they?
23     A. I could not answer that.
24     Q. But you're not aware of --
25     A. I don't know.

PAGE 34

34

1     Q. Are you aware of ever going to the Board and
2 asking them to approve the weapons and use of force
3 policy and procedure?
4     A. No, no. But we did furnish their attorney a
5 copy of it.
6     Q. All right. And the policy and procedure
7 regarding the chair, is that in this policy and
8 procedure, this weapons and use of force, General
9 Order 10?
10     A. I don't think so. I think it's a separate
11 policy.
12     Q. Okay. Well, you're not aware of any
13 incident where you went to the Board of Supervisors
14 regarding that policy and asked them to spread it on
15 the minutes and approve it, are you?
16     A. No, and I think the policy was in place when
17 I took office, and I don't know if my predecessor had
18 or not.
19     Q. You just adopted it as your policy and
20 procedure, correct?
21     A. With revisions.
22     Q. Sure. Okay. So the policy and procedure
23 regarding the restraint chair, you adopted it with
24 revisions from the last sheriff?
25     A. You know, I would -- I would say that

PAGE 35

35

1 because we did accept some of them, but there's a good
2 many that we changed. Of course, when ACA came in,
3 they reviewed everything.
4     Q. Yes.
5     A. And we had to meet their standard, which
6 was real strict.
7     Q. Sure. But as far as you know, you never
8 went to the Board of Supervisors with that policy and
9 procedure regarding the restraint chair and asked them
10 to approve it as part of their Board minutes?
11     A. No, not that I remember, no.
12     Q. That is because you, as Sheriff, set your
13 own policies and procedures regarding Booking and
14 arrests and things of your job, correct?
15     A. Basically, within guidelines.
16     Q. I understand. And you didn't expect or want
17 the Board of Supervisors to micromanage the way you
18 ran your jail, correct?
19     A. No. They wanted to, I think.
20     Q. You stated earlier -- the question was
21 asked you about the people that pled guilty over the
22 last six months to a year regarding their work at the
23 jail?
24     A. Uh-huh (indicating yes).
25     Q. And you were asked why it is that you or

PAGE 36

36

1 Major Payne didn't know about it and you felt it was
2 because they were hiding it. So, is it your opinion
3 that these people who pled guilty to different crimes
4 and acts of assault to prisoners at the Harrison
5 County Jail, that they were acting outside the course
6 and scope of their employment with the Harrison County
7 Sheriff and Harrison County when they performed those
8 acts?
9     MR. PRINGLE: Object to the form.
10 BY MS. YOUNG:
11     Q. You can answer it.
12     A. I think they admitted that.
13     Q. So the answer is yes?
14     A. Yes.
15     Q. And do you feel that that's accurate, that
16 they acted outside of the course and scope of their
17 employment, correct?
18     MR. PRINGLE: Object to the form.
19     A. Most definitely.
20 BY MS. YOUNG:
21     Q. Most definitely because they violated your
22 policies and procedures regarding how you wanted
23 officers to behave, correct?
24     A. That's correct.
25     Q. It's my understanding you have no knowledge

## PAGE 37 SHEET 10

37

1  whatsoever that these officers were abusing prisoners,
2  did you?
3      A.  When we had knowledge, we dealt with it.
4      Q.  That's what I thought. And if you had had
5  knowledge, you would have stopped it, correct?
6      A.  And did numerous times.
7      Q.  So this incident regarding Mr. Alves and the
8  Booking chair, is it your opinion that if any
9  mistreatment was given to Mr. Alves regarding leaving
10 him in the chair or whatever, that that act would have
11 been an act that occurred outside the course and scope
12 of the employment of the deputies?
13          MR. PRINGLE:  Object to the form.
14     A.  I think you'll find in our disciplinary
15 process that we went through it states that.
16 BY MS. YOUNG:
17     Q.  And the officers involved were disciplined?
18     A.  That's correct.
19     Q.  And to the best of your knowledge, when this
20 happened, when Mr. Alves was left in the chair too
21 long, was that the first time this ever occurred at
22 the jail?
23     A.  First time I'm aware of.
24     Q.  So, this was an isolated incident, wasn't
25 it?

## PAGE 38

38

1      A.  Best of my knowledge. I mean, he left the
2  jail walking on his own. Until he reported to the
3  hospital and told the doctor what happened, there was
4  no complaints. He was seen by medical there.
5      Q.  I wanted to be a little more specific. Can
6  you tell me who was disciplined regarding this action?
7      A.  You'd have to look in the --
8      Q.  I've got -- this is all I have regarding
9  it. Could you tell me, you know, by reviewing those
10 documents, what --
11     A.  Y'all have got that. I just reviewed it
12 again this morning, copies of the orders.
13     Q.  I just want the discipline action.
14     A.  It's available. You faxed it to me a couple
15 of days ago.
16         MR. TINER:  I think we have a copy of it.
17         MR. PEDERSEN:  Is this it?
18         MR. TINER:  No, we actually have the actual
19     orders. Let me go check.
20         - - -
21         (Off the record.)
22         - - -
23 BY MS. YOUNG:
24     Q.  Sheriff Payne, I'm going to hand you a
25 report dated March 17th, 2006 and ask you --

## PAGE 39

39

1          MR. TINER:  He's got a copy of it.
2      Q.  All right. If you can, identify that
3  document.
4      A.  It appears to be a Professional Standards
5  Unit report and internal investigation done by Captain
6  Campbell.
7      Q.  This was the Internal Affairs Professional
8  Standards investigation into the Alves incident?
9      A.  Correct.
10     Q.  I see that in the end it states the facts
11 and conclusions that all of the allegations regarding
12 excessive force by any deputies while encountering Mr.
13 Alves was found to be unfounded, correct?
14     A.  No.
15     Q.  Second paragraph, It was finally concluded
16 from this investigation?
17     A.  I'm looking on the last page on the
18 conclusions --
19     Q.  Right.
20     A.  -- which is usually what I dealt with.
21     Q.  Okay.
22     A.  It was concluded that Stolze and Evans
23 violated General Rule 14.6, Violation of any state
24 statute, order, department procedure or policy, and on
25 January 7th, 2006, they violated policy and

## PAGE 40

40

1  procedures, use of restraints by leaving inmate Alves
2  in a restraint chair in Booking approximately seven
3  hours without adhering to policy and checking on
4  Alves' restraints or welfare. The allegation was
5  sustained.
6      Q.  Okay. So that was the final conclusion?
7      A.  That's the final conclusion of the
8  investigation.
9      Q.  From your eight years of being sheriff,
10 there has never been a violation of that use of
11 restraint policy and procedure before?
12     A.  That I remember.
13     Q.  Would you agree with me that Deputies Stolze
14 and Evans' violation of General Order 1.46 was an
15 isolated incident?
16     A.  To the best of my knowledge, correct.
17         MS. YOUNG:  I'm going to introduce this as
18     exhibit, Lisa.
19         - - -
20         (Whereupon, Exhibit 2 was marked.)
21         - - -
22 BY MS. YOUNG:
23     Q.  Is it also your opinion that when those two
24 deputies left -- Deputy Stolze and Deputy Evans left
25 Mr. Alves in the chair for seven hours that they were

PAGE 41 SHEET 11

41

1  acting outside the course and scope of their
2  employment with the Sheriff's Department of Harrison
3  County?
4      A.  They were not following the procedure.
5      Q.  So the answer is yes?
6      A.  Yes.
7      MS. YOUNG: I'm through.
8           - - -
9           FURTHER EXAMINATION
10 BY MR. PRINGLE:
11     Q.  Mr. Stolze and Mr. Evans continued to be
12 employed by the Sheriff's Department after the Kasey
13 Alves incident, didn't they?
14     A.  Yes, after disciplinary procedure.
15     Q.  They continued to be employees, correct?
16     A.  I can't tell you if they're employees now or
17 not.
18     Q.  I know. But after the disciplinary
19 procedure, they continued to be employees?
20     A.  I believe so, correct.
21     Q.  You said that no negative reports were
22 issued concerning Kasey Alves. Did you read the
23 federal court indictments of the deputies?
24     A.  No.
25     Q.  So you don't know that those indictments

PAGE 42

42

1  include allegations concerning the abuse of Mr. Alves
2  then, do you?
3      A.  No, I don't.
4      Q.  Do you consider a federal court indictment a
5  negative report?
6      A.  In some cases.
7      Q.  Ms. Young asked you about it being your
8  jail. It's not the Sheriff's Department's jail, it's
9  the Harrison County Adult Detention facility, isn't
10 it?
11     A.  Correct.
12     Q.  There's no such legal entity as Harrison
13 County Sheriff's Department, is there?
14     A.  No.
15     Q.  And the Sheriff's Department would have had
16 the same access -- would've had the same videos
17 available to them that the Justice Department seized
18 during their investigation, correct?
19     A.  Well, we had access to them, but when they
20 took them, we no longer had access.
21     Q.  Okay. So prior to the time that the Justice
22 Department seized these videos, they were in Harrison
23 County and the Sheriff's Department's possession?
24     A.  Correct.
25     Q.  And subject to review by Harrison County

PAGE 43

43

1  employees or Harrison County Sheriff's Department
2  employees?
3      A.  Correct.
4      Q.  You may or may not know. Did all the
5  deputies that pled guilty continue to be employees of
6  Harrison County, Mississippi until such time as they
7  pled guilty in federal court?
8      A.  No. Once they were indicted, as I remember
9  it, they were released.
10     Q.  So they remained deputies at least until
11 such time as they were indicted by the federal
12 government, correct?
13     A.  Well, until such time as we were given
14 enough information to be able to have a disciplinary
15 hearing on it.
16     Q.  As far as a disciplinary hearing, that
17 would've been for the termination of the deputies?
18     A.  That would've been for the termination.
19 They have -- we have a process, a due process we have
20 to go through also. We are civil service and there is
21 due process.
22     Q.  To the best of your knowledge, did those
23 termination proceedings begin after the indictments of
24 the deputies?
25     A.  Some might have been before. You know, I

PAGE 44

44

1  have no idea on some of that.
2      Q.  But there would be a record of it?
3      A.  There's a record of it.
4      Q.  The disciplinary hearings held on officers,
5  those are recorded; are they not?
6      A.  They are. In most cases, they are.
7      Q.  I know Mr. Stolze's was recorded?
8      A.  Yeah.
9      Q.  And you would expect, would you not, that
10 the termination hearings would have been recorded?
11     A.  Well, certainly.
12     MR. PRINGLE: Okay. Thank you. That's it.
13     MR. PEDERSEN: No questions.
14          - - -
15          (Witness excused.)
16 (The deposition was concluded at 10:40 a.m.)
17          - - -

PAGE 45 SHEET 12

45

1                    CERTIFICATE
2    STATE OF MISSISSIPPI
3    COUNTY OF HARRISON
4           I, Lisa Hood Brown, Freelance Court Reporter
5    and Notary Public, duly commissioned for the County
6    of Harrison, State of Mississippi, do hereby certify:
7           That on the 12th day of February, 2008,
8    there appeared before me GEORGE PAYNE, JR., who was
9    sworn and examined to tell the truth, and that the
10   preceding forty-four (44) typewritten pages contain a
11   full, true and correct copy of my stenotype notes
12   and/or electronic tape recording of the testimony of
13   GEORGE PAYNE, JR.
14          That the witness has chosen to reserve
15   reading and signing of the deposition.
16          That I am not related to or in anywise
17   associated with any of the parties to this cause of
18   action, or their counsel, and that I am not
19   financially interested in the same;
20          IN WITNESS WHEREOF, I have hereunto set my
21   hand, this 3rd day of March, 2008.
22
23
24          Lisa Hood Brown, CSR No. 1166
            Notary Public, State of Mississippi,
25          County of Harrison. My commission
            expires 2-5-10.

PAGE 46

46

1                E R R A T A   S H E E T
2    STATE OF MISSISSIPPI
3    COUNTY OF _____
4           I, GEORGE PAYNE, JR., the undersigned
5    Deponent, having read the foregoing deposition, pages
6    numbered 4 through 44, find the same to be a true and
7    correct transcription of the proceedings taken at the
8    time and place indicated therein, except as follows,
9    (if any):
10   PAGE   LINE    WHERE IT READS:        SHOULD READ:
11   ____   ____    _____       _____
12   ____   ____    _____       _____
13   ____   ____    _____       _____
14   ____   ____    _____       _____
15   ____   ____    _____       _____
16   ____   ____    _____       _____
17   ____   ____    _____       _____
18   ____   ____    _____       _____
19   ____   ____    _____       _____
20
21                              GEORGE PAYNE, JR.
22   Sworn to and subscribed
     by me, this ____ day of
23   _____, A.D., 2008.
24   _____
     Notary Public, State of Mississippi,
25   County of _____.
     My commission expires: