```
 1                UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 3                      SOUTHERN DIVISION
 4
 5   KASEY D. ALVES,
 6              Plaintiff,
 7         VS.                    CAUSE NO.: 1:06cv912 LG-JMR
 8   HARRISON COUNTY MISSISSIPPI, BY AND
     THROUGH THE BOARD OF SUPERVISORS;
 9   HARRISON COUNTY SHERIFF'S DEPARTMENT;
     SHERIFF GEORGE PAYNE, JR.; AND,
10   HEALTH ASSURANCE, LLC.,
11              Defendants.
12
13                         DEPOSITION
14                            OF
15                     ROBERT N. ELEUTERIUS
16               Taken on behalf of the Plaintiff
17           9:37 a.m., Wednesday, March 12th, 2008
18                           before
19                 Lisa H. Brown, CSR #1166
20
21
22
23                    COAST-WIDE REPORTERS
                        Court Reporters
24                    Post Office Box 95
                  Biloxi, Mississippi  39533-0095
25                    (228) 374-5066
```

CERTIFIED

PLAINTIFF'S EXHIBIT "23"

```
 1         Q.   Do you remember any of the findings that
 2   Mr. Cabana made?  Do you recall anything in particular?
 3         A.   No, I don't.
 4         Q.   All right.  During the time that you served
 5   on the Board, did you ever review any other
 6   consultants' reports concerning the operation of the
 7   jail while Sheriff Payne was in office?
 8         A.   Only the -- it was an attorney.  Not any
 9   consultants, no.  I know about an attorney that was
10   giving us information who caused the Consent Decree to
11   go into effect.
12         Q.   Who was that attorney?
13              THE WITNESS:  In Jackson.
14              MS. YOUNG:  Ron Welch?
15              THE WITNESS:  Ron Welch.
16   BY MR. PRINGLE:
17         Q.   Ron Welch.  Okay.
18         A.   Yeah.
19         Q.   All right.  And on July 20, 2005, the
20   U.S. Department of Justice sent a letter or a report or
21   memorandum to Harrison County concerning the jail.
22   And, unfortunately, I have not been given a copy of
23   that yet.
24              Are you aware of that letter that was sent to
25   the Board concerning claims of incidents of misuse of
```

1  force at the jail?
2       A.  Yes.  I mean, I remember the letter coming,
3  and the specifics, I don't.  I do not.
4       Q.  You do remember the letter coming?
5       A.  Yes.
6       Q.  Do you remember what response, if any, the
7  Board made to the letter?
8       A.  No, because I don't recall exactly what was
9  specifically in that letter.  But I do know that
10 everything that was brought to our attention, we tried
11 to correct.  If it was a financial matter, that we
12 corrected.
13      Q.  So if the letter dealt with some financial
14 issue, the Board tried to correct it?
15      A.  That's correct.
16      Q.  But if the letter complained, let's say, of
17 incidents of misuse of force at the jail, what, if
18 anything, could the Board or would the Board do in
19 response to that?
20      A.  If we had any information like that, it was
21 turned over to the District Attorney.
22      Q.  To Mr. Caranna?
23      A.  Yes.
24      Q.  Do you recall whether or not the July 20,
25 2005 letter was given to Mr. Caranna?

1   A.  Okay.

2   Q.  Second paragraph, it says, "Detention staff
3   does not uniformly receive pre-service training and
4   annual in-service programs are not regularly
5   provided."
6   Were you informed of that information set
7   forth in this report?
8   A.  Yes.
9   Q.  Do you know if there was anything the Board
10  did in response to that finding?
11  A.  Other than possibly, you know, give
12  additional staffing, and then that -- as I told you
13  what I was looking for earlier, where we approved some
14  fifty deputies to be trained.  And that might have been
15  when -- the timing.  I just don't recall the dates and
16  times of all of this.
17  Q.  And then, the next sentence says, "The
18  majority of training is currently on-the-job."  Were
19  you informed of that finding?
20  A.  Yes.
21  Q.  And then, going down to the last paragraph
22  on page two, the first sentence says, "The morale of
23  the staff is extremely low."  Were you informed of
24  that finding?
25  A.  For twenty-four years, it's been real low out

there.

Q. And, again, I'm not going to beat this horse to death all day, but the Board just felt like it didn't have any authority to do anything about that type of finding?

A. That's correct.

MR. MEADOWS: Let's go off the record one minute, just to clarify it once and for all.

MR. PRINGLE: Sure.

- - -

(Off the record.)

- - -

A. To answer that question, once again, we've got dozens of Attorney General reports over the years with respect to that issue, and that's what's been in our mind, that we have no control on any of these issues.

BY MR. PRINGLE:

Q. And then, in that same paragraph, it says, "Staff claimed they are overworked." Were you aware of that finding?

A. Yes.

Q. Do you believe that that finding has been in existence for a number of years at the jail?

A. Yes, I do.

Q. Page -- I'm sorry. Go ahead.
A. One of the issues on that is I'm the only supervisor that was here when we actually built the jail.
Q. Right.
A. And we were sold that jail that we needed one deputy to run an entire pod, and that's how we managed to get this jail built, and we were drilled into that. But the minute we opened it up, we knew that we were understaffed, because the sheriff sold the project at the time that one person could take care of a whole pod and that's just impossible.
Q. Going to page three, the middle of the first paragraph at the top, six sentences down, it says, "Dr. Cabana stated that there were approximately 57 staff vacancies." Were you aware --
A. Yes.
Q. -- that that many vacancies existed at the time of this report?
A. Well, we -- actually, we never could find out over the past six or seven years how many vacancies was there, because one day there would be twenty, the next day there would be thirty, and then they would fill some and then they would lose some. I know it's been a good number. I did not remember --

Case 1:06-cv-00912-LG-JMR    Document 210-24    Filed 12/09/08    Page 7 of 9

33

```
 1  recall fifty-seven, but I knew there was a large
 2  number.
 3       Q.   And then, the last sentence of that
 4  paragraph says, "Staff in the booking area stated they
 5  were tired from the long hours."  Again, were you
 6  aware of that finding?
 7       A.   Yes.
 8       Q.   And do you believe that to be true?
 9       A.   Yes, it is.
10       Q.   And did you believe that to be true for a
11  number of years?
12       A.   Yes.
13       Q.   All right.  Going down to the bottom of page
14  three, the last paragraph, it says, "Due to inadequate
15  staffing levels."  Do you believe that the staffing
16  levels were inadequate at the jail?
17       A.   Yes, I do.
18       Q.   Do you believe they've been inadequate for a
19  number of years?
20       A.   Yes, I do.  And we've talked with two or
21  three sheriffs even prior to Sheriff Payne, and when we
22  would give them the staffing, they would never end up
23  at the jail.  They would end up somewhere else.  That
24  would be -- let me see.
25                          - - -
```

```
 1   the Mississippi Department of Employment Security,
 2   Work Force Investment Area:  Twin Districts for
 3   training -- it says on here -- thirty employees at the
 4   sheriff's department for the period of July 1st, 2005
 5   to 2006.
 6        Q.   What's the date of that entry?
 7        A.   That entry is June the 20th of 2000 -- I'm
 8   sorry.  Yeah, June 20th, 2005.
 9        Q.   All right.  Continuing back on page three, it
10   then says, "poorly-trained staff."  Were you in
11   informed of that finding?
12        A.   Yes.  I recall all these terms, yes.
13        Q.   Did you agree with that finding?
14        A.   Yes, I did.
15        Q.   Do you think that that had been -- the
16   poorly-trained staff had been occurring at the jail for
17   a number of years?
18        A.   Not in all departments, but possibly at the
19   jail itself, yes.
20        Q.   Yeah.  Let me -- I'll try to rephrase that.
21             Do you believe that poorly-trained staff
22   existed at the detention center for a number of years?
23        A.   Yes.
24        Q.   The next finding said that there was limited
25   supervision, on page three still in that same
```

1  paragraph.
2      A.  Uh-huh (indicating yes.)
3      Q.  Were you made aware of that finding?
4      A.  Yes.
5      Q.  Did you believe that that problem existed at
6  the jail?
7      A.  Yes, I did.
8      Q.  Did you believe that that problem existed at
9  the jail for a number of years?
10     A.  Yes.
11     Q.  I'm going to skip "crowded conditions." But
12 the next one says, "failure to follow established
13 policies and procedures." Were you aware of that
14 finding?
15     A.  I don't recall it, but I'm sure it was in
16 there.
17     Q.  As a member of the Board, would you have
18 agreed that that existed at the Harrison County jail?
19     A.  Yes.
20     Q.  Would you agree that that existed for a
21 number of years?
22     A.  Yes.
23     Q.  And going to page four, at the very top, it
24 says, "Significant and immediate steps must be taken to
25 improve the overall professionalism of the jail,