1            UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3              SOUTHERN DIVISION

4

5  KASEY D. ALVES,

6       Plaintiff,

7    VS.             CAUSE NO.: 1:06cv912 LG-JMR

8  HARRISON COUNTY MISSISSIPPI, BY AND
    THROUGH THE BOARD OF SUPERVISORS;
9  HARRISON COUNTY SHERIFF'S DEPARTMENT;
    SHERIFF GEORGE PAYNE, JR.; AND,
10  HEALTH ASSURANCE, LLC.,

11       Defendants.

12

13               DEPOSITION

14                  OF

15          ROBERT N. ELEUTERIUS

16      Taken on behalf of the Plaintiff

17    9:37 a.m., Wednesday, March 12th, 2008

18              before

19       Lisa H. Brown, CSR #1166

20

21

22

23         COAST-WIDE REPORTERS
           Court Reporters
24         Post Office Box 95
      Biloxi, Mississippi  39533-0095
25         (228) 374-5066


PENGAD-Bayonne, N. J.
PLAINTIFF'S
EXHIBIT
21"

1      Q.   Do you remember any of the findings that

2   Mr. Cabana made?  Do you recall anything in particular?

3      A.   No, I don't.

4      Q.   All right.  During the time that you served

5   on the Board, did you ever review any other

6   consultants' reports concerning the operation of the

7   jail while Sheriff Payne was in office?

8      A.   Only the -- it was an attorney.  Not any

9   consultants, no.  I know about an attorney that was

10  giving us information who caused the Consent Decree to

11  go into effect.

12     Q.   Who was that attorney?

13          THE WITNESS:  In Jackson.

14          MS. YOUNG:  Ron Welch?

15          THE WITNESS:  Ron Welch.

16  BY MR. PRINGLE:

17     Q.   Ron Welch.  Okay.

18     A.   Yeah.

19     Q.   All right.  And on July 20, 2005, the

20  U.S. Department of Justice sent a letter or a report or

21  memorandum to Harrison County concerning the jail.

22  And, unfortunately, I have not been given a copy of

23  that yet.

24          Are you aware of that letter that was sent to

25  the Board concerning claims of incidents of misuse of

1    force at the jail?

2        A.    Yes.  I mean, I remember the letter coming,

3    and the specifics, I don't.  I do not.

4        Q.    You do remember the letter coming?

5        A.    Yes.

6        Q.    Do you remember what response, if any, the

7    Board made to the letter?

8        A.    No, because I don't recall exactly what was

9    specifically in that letter.  But I do know that

10   everything that was brought to our attention, we tried

11   to correct.  If it was a financial matter, that we

12   corrected.

13       Q.    So if the letter dealt with some financial

14   issue, the Board tried to correct it?

15       A.    That's correct.

16       Q.    But if the letter complained, let's say, of

17   incidents of misuse of force at the jail, what, if

18   anything, could the Board or would the Board do in

19   response to that?

20       A.    If we had any information like that, it was

21   turned over to the District Attorney.

22       Q.    To Mr. Caranna?

23       A.    Yes.

24       Q.    Do you recall whether or not the July 20,

25   2005 letter was given to Mr. Caranna?

1    A.    Okay.

2    Q.    Second paragraph, it says, "Detention staff

3  does not uniformly receive pre-service training and

4  annual in-service programs are not regularly

5  provided."

6         Were you informed of that information set

7  forth in this report?

8    A.    Yes.

9    Q.    Do you know if there was anything the Board

10  did in response to that finding?

11   A.    Other than possibly, you know, give

12  additional staffing, and then that -- as I told you

13  what I was looking for earlier, where we approved some

14  fifty deputies to be trained.  And that might have been

15  when -- the timing.  I just don't recall the dates and

16  times of all of this.

17   Q.    And then, the next sentence says, "The

18  majority of training is currently on-the-job."  Were

19  you informed of that finding?

20   A.    Yes.

21   Q.    And then, going down to the last paragraph

22  on page two, the first sentence says, "The morale of

23  the staff is extremely low."  Were you informed of

24  that finding?

25   A.    For twenty-four years, it's been real low out

1   there.

2       Q.   And, again, I'm not going to beat this horse

3   to death all day, but the Board just felt like it

4   didn't have any authority to do anything about that

5   type of finding?

6       A.   That's correct.

7           MR. MEADOWS:   Let's go off the record one

8       minute, just to clarify it once and for all.

9           MR. PRINGLE:   Sure.

10                          - - -

11                    (Off the record.)

12                          - - -

13      A.   To answer that question, once again, we've

14  got dozens of Attorney General reports over the years

15  with respect to that issue, and that's what's been in

16  our mind, that we have no control on any of these

17  issues.

18  BY MR. PRINGLE:

19      Q.   And then, in that same paragraph, it says,

20  "Staff claimed they are overworked."  Were you aware of

21  that finding?

22      A.   Yes.

23      Q.   Do you believe that that finding has been in

24  existence for a number of years at the jail?

25      A.   Yes, I do.

1      Q.    Page -- I'm sorry.  Go ahead.

2      A.    One of the issues on that is I'm the only

3  supervisor that was here when we actually built the

4  jail.

5      Q.    Right.

6      A.    And we were sold that jail that we needed

7  one deputy to run an entire pod, and that's how we

8  managed to get this jail built, and we were drilled

9  into that.  But the minute we opened it up, we knew

10  that we were understaffed, because the sheriff sold

11  the project at the time that one person could take

12  care of a whole pod and that's just impossible.

13      Q.    Going to page three, the middle of the first

14  paragraph at the top, six sentences down, it says,

15  "Dr. Cabana stated that there were approximately 57

16  staff vacancies."  Were you aware --

17      A.    Yes.

18      Q.    -- that that many vacancies existed at the

19  time of this report?

20      A.    Well, we -- actually, we never could find

21  out over the past six or seven years how many

22  vacancies was there, because one day there would be

23  twenty, the next day there would be thirty, and then

24  they would fill some and then they would lose some.  I

25  know it's been a good number.  I did not remember --

1    recall fifty-seven, but I knew there was a large

2    number.

3         Q.    And then, the last sentence of that

4    paragraph says, "Staff in the booking area stated they

5    were tired from the long hours."  Again, were you

6    aware of that finding?

7         A.    Yes.

8         Q.    And do you believe that to be true?

9         A.    Yes, it is.

10        Q.    And did you believe that to be true for a

11   number of years?

12        A.    Yes.

13        Q.    All right.  Going down to the bottom of page

14   three, the last paragraph, it says, "Due to inadequate

15   staffing levels."  Do you believe that the staffing

16   levels were inadequate at the jail?

17        A.    Yes, I do.

18        Q.    Do you believe they've been inadequate for a

19   number of years?

20        A.    Yes, I do.  And we've talked with two or

21   three sheriffs even prior to Sheriff Payne, and when we

22   would give them the staffing, they would never end up

23   at the jail.  They would end up somewhere else.  That

24   would be -- let me see.

25                                    -  -  -

1    the Mississippi Department of Employment Security,

2    Work Force Investment Area:  Twin Districts for

3    training -- it says on here -- thirty employees at the

4    sheriff's department for the period of July 1st, 2005

5    to 2006.

6         Q.    What's the date of that entry?

7         A.    That entry is June the 20th of 2000 -- I'm

8    sorry.  Yeah, June 20th, 2005.

9         Q.    All right.  Continuing back on page three, it

10   then says, "poorly-trained staff."  Were you in

11   informed of that finding?

12        A.    Yes.  I recall all these terms, yes.

13        Q.    Did you agree with that finding?

14        A.    Yes, I did.

15        Q.    Do you think that that had been -- the

16   poorly-trained staff had been occurring at the jail for

17   a number of years?

18        A.    Not in all departments, but possibly at the

19   jail itself, yes.

20        Q.    Yeah.   Let me -- I'll try to rephrase that.

21              Do you believe that poorly-trained staff

22   existed at the detention center for a number of years?

23        A.    Yes.

24        Q.    The next finding said that there was limited

25   supervision, on page three still in that same

```
 1   paragraph.

 2          A.    Uh-huh (indicating yes.)

 3          Q.    Were you made aware of that finding?

 4          A.    Yes.

 5          Q.    Did you believe that that problem existed at

 6   the jail?

 7          A.    Yes, I did.

 8          Q.    Did you believe that that problem existed at

 9   the jail for a number of years?

10          A.    Yes.

11          Q.    I'm going to skip "crowded conditions."  But

12   the next one says, "failure to follow established

13   policies and procedures."  Were you aware of that

14   finding?

15          A.    I don't recall it, but I'm sure it was in

16   there.

17          Q.    As a member of the Board, would you have

18   agreed that that existed at the Harrison County jail?

19          A.    Yes.

20          Q.    Would you agree that that existed for a

21   number of years?

22          A.    Yes.

23          Q.    And going to page four, at the very top, it

24   says, "Significant and immediate steps must be taken to

25   improve the overall professionalism of the jail,
```