```
 1   back for your midafternoon break.
 2        (Jury out at 2:55 p.m.)
 3            THE COURT:  All right.  We'll take a 20 minute
 4   recess.
 5        (Recess at 2:55 p.m., until 3:16 p.m.)
 6            THE COURT:  Prosecution ready to proceed?
 7            MS. KRIGSTEN:  Thank you.  We're ready to call our
 8   next witness.
 9            THE COURT:  Mr. Weber?
10            MR. WEBER:  Yes, Your Honor.
11            THE COURT:  Mr. Davis?
12            MR. DAVIS:  Yes, Your Honor.
13            THE COURT:  Please bring in the jury.
14        (Jury in at 3:16 p.m.)
15            THE COURT:  You may call your next witness.
16            MS. KRIGSTEN:  Thank you, Your Honor.  The government
17   calls Regina Rhodes.
18                        REGINA RHODES
19   was thereupon called as a witness for and on behalf of the
20   government and, having been duly sworn, testified as follows:
21            THE COURT:  You may proceed.
22            MS. KRIGSTEN:  Thank you, Your Honor.
23                      DIRECT EXAMINATION
24   BY MS. KRIGSTEN:
25   Q.  Will you please state your name for the record?
```

PLAINTIFF'S EXHIBIT "26"

1   Q.  Could you describe the initial contact you had with
2   Ms. Horn?
3   A.  We were attempting to put her in the cell for processing.
4   And when she made it into the cell, she splashed a half glass
5   of water on myself and Captain Gaston.
6   Q.  How did you react?
7   A.  I stood there for a half a second. And when Gaston went
8   in, I went in after.
9   Q.  What did Defendant Gaston do, if anything?
10  A.  He made physical contact with Ms. Horn.
11  Q.  What exactly did Defendant Gaston do?
12  A.  He struck her.
13  Q.  Pardon me?
14  A.  He struck her.
15  Q.  Where did Defendant Gaston strike her on her body?
16  A.  Either her face or her upper body. I didn't see exactly
17  where the punch landed.
18  Q.  Where on Abra Horn -- with what did Defendant Gaston
19  strike Abra Horn's body?
20  A.  A closed fist.
21  Q.  Was there just one strike?
22  A.  No, ma'am.
23  Q.  How many strikes did you observe?
24  A.  It was repeated.
25  Q.  Okay. What did you do?

```
1    A.   I turned around and hit her.
2    Q.   Just once?
3    A.   Repeatedly.
4    Q.   Where did you hit her?
5    A.   Up on top of her shoulders.
6    Q.   Why --
7    A.   Closed fisted blows.
8    Q.   Why did you hit her?
9    A.   I was agitated that she had spit on me and disgusted.
10   Q.   You were angry?
11   A.   Very much so.
12   Q.   Was there any legitimate reason at that time for you to be
13   hitting Abra Horn?
14   A.   No, ma'am.
15   Q.   When you were hitting her, did anyone tell you to stop?
16   A.   No, ma'am.
17   Q.   Did Defendant Gaston say anything?
18   A.   No, ma'am.
19   Q.   Did Defendant Gaston attempt to stop you?
20   A.   No, ma'am.
21   Q.   What happened next?
22   A.   We went through the crash gate.  I held the door open for
23   them.  And we placed her in central holding.
24   Q.   After Abra Horn was placed in central holding, did
25   Defendant Gaston reprimand you in any way?
```

```
1    A.  Yes, I did.
2    Q.  Have you ever used the term "brother by a different
3    mother"?
4    A.  Brother -- yes, ma'am.
5    Q.  Have you used that term in connection with the officers
6    you worked for -- you worked with in booking?
7    A.  Yes, ma'am.
8    Q.  Explain to the jury in what context you meant that term.
9    A.  As they were -- we were a close family.  Brother from
10   another mother or sister from another mother.  That we were
11   extremely tight.  We depended on each other.
12   Q.  Okay.  Were you present in the jail on August 9th, 2006,
13   when Shell Abrams was brought in?
14   A.  I don't believe so, ma'am.
15   Q.  Do you remember overhearing a conversation following an
16   incident with Ms. Shell Abrams that day involving Defendant
17   Gaston?
18   A.  Yes, ma'am.  When I went to pick up a friend who was
19   working.
20   Q.  What do you recall overhearing?
21   A.  That the chief had her dog trained with the taser.
22   Q.  Who is the chief?
23   A.  Captain Gaston.
24           MR. DAVIS:  Objection to who's making this particular
25   comment, Your Honor.  She hasn't identified who was making it.
```

1  A. Yes, ma'am.

2  Q. Would you spray her?

3  A. Sometimes. I would -- I'd tell her: "See, my boss wants
4  me to spray you. You going to get naked, or are you going to
5  make me spray you?"

6  Q. At the time that you sprayed some of these women, were
7  they physically combative?

8  A. No, ma'am.

9  Q. At the time that you sprayed some of these women, did you
10 violate the use of force policy using that OC spray?

11 A. Yes, ma'am.

12 Q. Were you present for an incident involving Kasey Alves?

13 A. Yes, ma'am.

14 Q. Were you working at booking when Kasey Alves was brought
15 into the jail?

16 A. Yes, ma'am.

17 Q. Are you familiar with the jail's use of force -- policy on
18 the use of restraints?

19 A. Yes, ma'am.

20        MS. KRIGSTEN: May I approach this witness, Your
21 Honor?

22        THE COURT: You may.

23 BY MS. KRIGSTEN:

24 Q. I just handed you Government's Exhibit No. 10. Do you
25 recognize that document?

MARGARET WASMUND, RMR, CRR

Rhodes 6

```
 1    A.  OIC Teel.
 2    Q.  Okay.  Do you recognize the individual who is standing
 3  against the left-hand side of that screen at 5:00:14?
 4    A.  On the left-hand side, ma'am?  The officer?
 5    Q.  In the bottom corner, the left-hand side of that bottom
 6  panel?
 7    A.  That's Kasey Alves.
 8    Q.  Who is that individual with Kasey Alves at that time?
 9    A.  OIC Teel.
10    Q.  Was that you that just left the screen?
11    A.  Yes, ma'am.
12    Q.  Was that 5:01:27?
13    A.  Yes, ma'am.
14    Q.  At this time -- we're at 5:01:37.  At this time, have you
15  had any physical contact with Kasey Alves?
16    A.  No, ma'am.
17    Q.  Have you had any conversation with Kasey Alves?
18    A.  No, ma'am.
19    Q.  Okay.  At this time, has Kasey Alves spit on you?
20    A.  No, ma'am.
21    Q.  Have you observed Kasey Alves spit on anyone?
22    A.  No, ma'am.
23    Q.  Is that you now at 5:01:55 near Kasey Alves?
24    A.  Yes, ma'am.
25    Q.  What are you doing, if you recall, at this time?
```

1  A. Taunting Mr. Alves.

2  Q. In what way are you taunting him?

3  A. Saying just stuff like "Bet you wish you hadn't have done
4  that" or, you know, "How do you like that?"

5  MR. DAVIS: Objection. She's just speculating as to
6  what she may have said, Judge. It sounds like --

7  THE COURT: Objection overruled.

8  BY MS. KRIGSTEN:

9  Q. And why would you be saying "I'll bet you wish you hadn't
10  done that" to Kasey Alves?

11  A. Because now he's on the floor.

12  Q. You were present when he was taken to the floor; is that
13  correct?

14  A. Yes, ma'am.

15  Q. Did you see why he was taken to the floor?

16  A. No, ma'am.

17  Q. Did you know of any legitimate reason for him to be taken
18  to the floor?

19  A. No, ma'am.

20  MR. DAVIS: Objection, Your Honor. She just said she
21  didn't see why he was taken to the floor --

22  THE COURT: She can testify --

23  THE REPORTER: I didn't hear the last part. "Why he
24  was taken to the floor." I didn't hear anything after that.

25  MR. DAVIS: Judge, we just object to her giving an

1  A.  Yes, ma'am.
2  Q.  Had you seen any -- at that point, had you seen any threat
3  to officer safety?
4  A.  No, ma'am.
5  Q.  Had you seen any threat that Mr. Alves posed to himself?
6  A.  No, ma'am.
7  Q.  Had you seen any reason that Mr. Alves needed to be placed
8  in the restraint chair?
9  A.  No, ma'am.
10 Q.  Had you heard Mr. Alves make any comments?
11 A.  Not that I can remember.
12 Q.  At 5:04:13, there is another individual who has joined --
13 or who is near you, Deputy Teel and Kasey Alves.  Who is that
14 individual?
15 A.  Deputy Windham.
16 Q.  Are you aware of whether OC spray was used against Kasey
17 Alves while he was on the floor?
18 A.  Yes, ma'am.
19 Q.  Who used OC spray?
20 A.  OIC Teel.
21 Q.  Do you know where he got that OC spray from?
22 A.  It appeared to have come from Deputy Windham?
23 Q.  While you were there, did you see any legitimate reason
24 for Kasey Alves to be OC sprayed?
25 A.  No, ma'am.

```
 1   Q.  It appears at 5:05:09 you handed something to Deputy Teel.
 2   Do you recall what that object was?
 3   A.  A handcuff key.
 4   Q.  And did you see what Deputy Teel did with that?
 5   A.  He switched out handcuffs with Officer Manning.
 6   Q.  At any time, was Kasey Alves completely unhandcuffed?
 7   A.  No, ma'am.
 8   Q.  At this time, are you the person -- it's 5:06:35.  Are you
 9   the person to Kasey Alves' feet?
10   A.  Yes, ma'am.
11   Q.  And which direction are you facing?
12   A.  Towards his head.
13   Q.  Who is the person who is leaning over Mr. Alves?
14   A.  OIC Teel.
15   Q.  At this time, what, if anything, did you see Defendant
16   Teel do?
17   A.  I can't recall.
18   Q.  At any time while you were at Kasey Alves' feet, did Kasey
19   Alves point -- pose a threat to you?
20   A.  No, ma'am.
21   Q.  Did he pose a threat to any of the other officers?
22   A.  No, ma'am.
23   Q.  Did he pose a threat to himself?
24   A.  No, ma'am.
25   Q.  At 5:06:59, it appeared that Defendant Teel's arm raised
```

BY MR. DAVIS:

Q    You indicated there were some blows to Mr. Alves, but you have had an opportunity to review this video, haven't you, Ms. Rhodes?

A    Yes, I have.

Q    As far as actually seeing these blows that Mr. Teel gave to Alves, I think you indicated that you hit Mr. Alves some, too; is that correct?

A    Yes, I did.

Q    You can't really see them on the video, can you?

A    I could see them when I was standing there.

Q    Correct. Again, the question was, you can't really see them on the video, though, can you?

A    I guess not.

Q    So all we have to trust about these blows taking place is your word; is that right?

A    And the injuries to Mr. Alves.

Q    Correct. Are you aware of the injuries to Mr. Alves?

A    I did hear that he suffered some injuries while he was in the restraint chair and in our custody.

Q    Correct, but was that in relation to any blows he received from anybody?

A    I could not get a definitive answer on that whether it was or not.

Q    And in particularly with Mr. Williams, you indicated that

Rhodes 5

1  Q   And you have read this?
2  A   Yes, I have.
3  Q   You read this plea agreement.  And you agreed that this is
4  what happened?
5  A   Yes, sir.
6  Q   And that you observed -- you and Deputy Teel routinely
7  abused inmates?
8  A   Yes, sir.
9  Q   And you and those other brothers on your shift routinely
10 abused inmates?
11 A   Yes, sir.
12 Q   And Captain Gaston didn't work your shift, did he?
13 A   No, he did not.
14 Q   And you talked about Abra Horn.  Do you remember Abra
15 Horn?
16 A   Yes, I do.
17 Q   She came in during Mardi Gras, right?
18 A   Yes.
19 Q   Describe for us booking during Mardi Gras.
20 A   It was busy.
21 Q   How many people came in to be booked during Mardi Gras?
22 A   I have no idea.
23 Q   How many law enforcement agencies brought people to
24 Harrison County Jail to be booked during Mardi Gras?
25 A   Several.

Rhodes 6A

```
 1   paragraph number five, that is several paragraphs long.  At the
 2   bottom of page four, does that section end with "This statement
 3   of facts does not contain each and every fact known to the
 4   defendant and the United States concerning the defendants' and
 5   others' involvement in the offense conduct and other matters"?
 6   A    Yes, ma'am.
 7   Q    So this plea agreement is not everything that you knew
 8   about at the jail?
 9   A    No, ma'am.
10   Q    This plea agreement doesn't detail all of the criminal
11   acts that you witnessed while you were at the jail?
12   A    No, ma'am.
13   Q    You were asked some questions about Defendant Gaston.  Did
14   Defendant Gaston know that booking officers were using
15   excessive force?
16           MR. WEBER:  Objection, speculation.
17           THE COURT:  Objection sustained.  Rephrase your
18   question.
19   BY MS. KRIGSTEN:
20   Q    Was Defendant Gaston present when booking officers used
21   excessive force?
22   A    Yes, he was.
23           MR. DAVIS:  Objection to the word "excessive force,"
24   Your Honor.
25           THE COURT:  Overruled.
```

BY MS. KRIGSTEN:

Q   Was Defendant Gaston present when officers boasted about their uses of excessive force?

A   Yes, he was.

Q   Was Defendant Gaston present when officers talked about hiding their uses of excessive force?

A   Yes.

Q   Were officers talking about hiding their uses of excessive force from Defendant Gaston?

      **COURT REPORTER:**  Slow down, please.

      **MR. DAVIS:**  Objection to leading, Judge.

      **THE COURT:**  Objection to leading is sustained.  The observation by the court reporter is also sustained.  Slow down just a little bit.

      **MS. KRIGSTEN:**  Yes, sir.

BY MS. KRIGSTEN:

Q   Who, if anyone, were booking officers attempting to hide their assaults from at the jail?

A   IA.

Q   Did you ever hear an officer state that they wanted to hide something from Defendant Gaston?

A   No.

Q   How was Defendant Gaston viewed by the booking officers?

A   He was one of our brothers.

Q   You've talked about Defendant Stolze -- or Karl Stolze,

```
 1  Alves spitting at him?
 2  A    No.  I just read it in his report.
 3  Q    Did you see any actions by Defendant Teel consistent with
 4  Kasey Alves spitting at him?
 5  A    No.
 6          MR. DAVIS:  Objection to leading, Your Honor.
 7          THE COURT:  Objection sustained.
 8  BY MS. KRIGSTEN:
 9  Q    What, if any, actions did you see from Defendant Teel
10  regarding Kasey Alves potentially spitting at him?
11  A    None.
12  Q    You were asked some questions about the Jessie Williams
13  incident.  The crime that you pled guilty to, who is the victim
14  of that crime?
15  A    Mr. Jessie Williams.
16  Q    You were asked questions about your use of force.  The use
17  of force that you used on Mr. Williams, did you see any
18  justification for that?
19  A    No, ma'am.
20  Q    Did you see any justification for the use of force that
21  Defendant Teel used?
22          MR. DAVIS:  Objection to leading, Your Honor.  It is
23  requesting an opinion outside of her qualifications.
24          THE COURT:  You covered this on Direct, and the
25  objection to leading is sustained.
```