```
              UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

                    SOUTHERN DIVISION


KASEY D. ALVES,

        Plaintiff,

    VS.                    CAUSE NO.: 1:06cv912 LG-JMR

HARRISON COUNTY MISSISSIPPI, BY AND
THROUGH THE BOARD OF SUPERVISORS;
HARRISON COUNTY SHERIFF'S DEPARTMENT;
SHERIFF GEORGE PAYNE, JR.; AND,
HEALTH ASSURANCE, LLC.,

        Defendants.



                        DEPOSITION

                            OF

                 CHARLES LARRY BENEFIELD

            Taken on behalf of the Plaintiff

        10:49 a.m., Wednesday, March 12th, 2008

                          before

                Lisa H. Brown, CSR #1166




                   COAST-WIDE REPORTERS
                     Court Reporters
                   Post Office Box 95
              Biloxi, Mississippi  39533-0095
                      (228) 374-5066
```

PLAINTIFF'S EXHIBIT "48"

```
 1                        - - -
 2                CHARLES LARRY BENEFIELD,
 3   having been produced and first duly sworn, was
 4   examined and testified as follows:
 5                        - - -
 6                      EXAMINATION
 7   BY MR. PRINGLE:
 8        Q.   Please state your name.
 9        A.   Charles Larry Benefield.
10        Q.   Mr. Benefield, you served as a member of the
11   Harrison County Board of Supervisors?
12        A.   Yes.
13        Q.   And what years did you serve?
14        A.   From, I think, 1991 to January the 6th of
15   '08.
16        Q.   And during that time, at various times, you
17   also served as president of the Board?
18        A.   Yes.
19        Q.   Do you remember how many occasions you served
20   as president?
21        A.   Gee.  Approximately seven out of the -- the
22   so many years that I was on the Board, sixteen years.
23   I don't remember the exact date.  Last year, 2007,
24   would have been one of them.  Early 2000 to 2004,
25   maybe.
```

```
 1        Q.   So you were a member of the Board of
 2   Supervisors, then, when the Consent Judgment was
 3   entered by the United States District Court on January
 4   12, 1995; is that correct?
 5        A.   Yes.
 6        Q.   And I guess as a member of the Board, then,
 7   you would have been involved in the approval of the
 8   this agreement; is that correct?
 9        A.   Can I have just a second?  Let me look.
10        Q.   Sure.  Take your time.
11             MR. PEDERSEN:  Is this Exhibit 1 we're
12        looking at?
13             MR. PRINGLE:  Yes, Exhibit 1.
14        A.   Yes.
15   BY MR. PRINGLE:
16        Q.   Okay.  Let me go through some of these pages
17   with you.
18             MR. MEADOWS:  Excuse me.  Off the record.
19                         - - -
20                    (Off the record.)
21                         - - -
22   BY MR. PRINGLE:
23        Q.   On page three of the judgment, if you'll look
24   at that, paragraph five.  Do you see that?
25        A.   Uh-huh (indicating yes.)
```

```
 1        Q.   It says, "'Defendants' shall refer to
 2   Harrison County, Mississippi," and then there are some
 3   other entities listed, but you understood that
 4   Harrison County, Mississippi was a defendant in this
 5   lawsuit?
 6        A.   Yes.
 7        Q.   And then on page four, go down to Roman
 8   Numeral IV.  The last paragraph, A, it says, Security
 9   and Supervision.
10             Do you see that?
11        A.   Uh-huh (indicating yes.)
12        Q.   It says, "Defendants shall provide a safe and
13   secure living environment to all inmates housed at
14   HCDC."
15             Do you see that?
16        A.   Uh-huh (indicating yes.)
17        Q.   And one of the Defendants, again, that
18   they're referring to is Harrison County, Mississippi;
19   is that correct?
20        A.   It's referring to the County and the sheriff,
21   yes.
22        Q.   One of them is Harrison County, Mississippi?
23        A.   Yes.
24        Q.   And then, it says, "To this end, Defendants
25   shall undertake corrective measures in each of the
```

1  following areas"; is that correct?
2     A.   Uh-huh (indicating yes.)
3     Q.   Okay. And on page five, number twelve, one
4  of the areas they're talking about is staffing; is that
5  correct?
6     A.   Yes.
7     Q.   During the time that you served as a member
8  of the Board of Supervisors, was staffing at the jail a
9  continuous issue with the sheriff?
10    A.   Yes.
11    Q.   And as far as the management of the Harrison
12 County Jail, what role, if any, does the Board of
13 Supervisors play in that?
14    A.   Only from a fiscal responsibility of
15 providing a budget to the sheriff.
16    Q.   In that process, the sheriff submits a budget
17 to the Board?
18    A.   Yes.
19    Q.   And then the Board takes what action once the
20 budget is submitted?
21    A.   We approve or disapprove it.
22    Q.   All right. And staffing. One of the issues
23 on staffing is the funding of the staff; is that
24 correct?
25    A.   Yes.

1    A.   No, sir.  We were of the understanding that
2 the sheriff's attorney would make those reports, and we
3 never received anything telling us that he did receive
4 them -- that the court did receive them.
5    Q.   Do you know if the Board ever requested to
6 see a copy of the status report?
7    A.   I think several times we had requested it,
8 but not necessarily in this time frame.  But in later
9 years, I think we probably did.
10   Q.   Well, let's say between the calendar years
11 2000 and 2006, do you remember the Board ever
12 requesting a copy of the status reports?
13   A.   I think only one time, and that had to do
14 with when the Justice Department had some issues with
15 the staffing, I think we requested to see some.  I
16 don't know if we ever got them, but I think we
17 requested them.  We did, at many times, ask for the
18 filing of the reports.  And the answer we always
19 received was, yes, and that was through the sheriff's
20 department's attorney.
21   Q.   How did the Board ensure compliance with this
22 Consent Decree?
23   A.   Basically, it was the -- you know, in order
24 to consent with this decree, most of the authority
25 lies with the sheriff.  All we could do was depend on

```
 1   the Justice Department that if -- you know, if
 2   something was not being done properly per the consent
 3   order, that they would notify the Board of Supervisors
 4   that we were not in compliance.
 5       Q.   So did the Board in any way monitor
 6   compliance with the Consent Decree?
 7       A.   No, sir, other than when the sheriff
 8   requested things that he needed to meet the decree, we
 9   provided the financing to do that.
10       Q.   So the Board relied upon the sheriff to
11   comply with the decree?
12       A.   Yes, sir.
13       Q.   Are you aware of a July 20, 2005 letter from
14   the U.S. Department of Justice to the Board concerning
15   concerns they had at the Harrison County jail?
16       A.   Was that considered staffing?  Is that what
17   that was concerning?
18       Q.   Well, part of it had to do with incidents of
19   misuse of force.  Do you recall receiving a copy of
20   that letter?
21           MR. MEADOWS:  This is a letter and not a
22       report?  Are you talking about a letter or
23       report?
24           MR. PRINGLE:  A letter.
25       A.   This was 2002?
```

```
 1        A.   No, sir.
 2        Q.   Have you ever seen them?
 3        A.   No, sir.
 4        Q.   Have you ever seen the sheriff's general
 5   orders?
 6        A.   No, sir.
 7        Q.   Have you ever asked to see them?
 8        A.   No, sir.
 9        Q.   I'll take Exhibit 1 back and trade with you
10   and give you Exhibit 2.
11        A.   Thank you.
12        Q.   And ask you to take a look at that and see if
13   you have ever seen that before.
14        A.   I have.
15        Q.   Have you had a chance to read it prior to
16   today?
17        A.   I think we reviewed it.  It was back in the
18   nineties.  I can't remember the exact year.  I don't
19   see a date of the report.  I'm guessing it was the
20   mid-nineties, '96, '7, '5, somewhere in that time
21   frame.
22        Q.   But, to your knowledge, you have seen the
23   report before?
24        A.   Yes, sir, I have.
25        Q.   All right.  Turn to page two.  The second
```

```
 1   paragraph says, "Detention staff does not uniformly
 2   receive pre-service training and annual in-service
 3   programs are not being regularly provided."
 4          Were you aware of that finding?
 5       A.   I'm sure -- I read over it.  I'm sure I read
 6   it at one time.
 7       Q.   Do you recall that finding?
 8       A.   No, sir.  I just remember vaguely the report.
 9       Q.   I'm not going to cover everything, but I want
10   to cover some things.
11       A.   Sure.
12       Q.   The next sentence says, "The majority of
13   training is currently on-the-job."  Were you aware of
14   that finding?
15       A.   Yes, sir.
16       Q.   The last paragraph, page two.  It says, "The
17   morale of the staff is extremely low."  Were you aware
18   of that finding?
19       A.   It seems that I do.  At that time, yes.
20       Q.   Would you agree with that finding?
21       A.   At that time, yes.
22       Q.   And, again, I'm talking about as it pertains
23   only to the jail, not the rest of the sheriff's
24   department.
25       A.   Yes.
```

```
 1        Q.   And it says, "Staff claimed they are
 2   overworked."  Were you aware of that finding?
 3        A.   I heard those complaints, yes, sir.
 4        Q.   Did you agree with that finding?
 5        A.   At that time, yes, sir.
 6        Q.   Go to page three and go down to the bottom,
 7   the last paragraph.  It says, "Due to inadequate
 8   staffing levels."  Do you see that?
 9        A.   Yes, sir.
10        Q.   Were you aware of that finding?
11        A.   Yes, sir.
12        Q.   Would you agree with that finding?
13        A.   At that time, yes, I think there was some
14   issues out there.  And this is just my opinion based on
15   what, you know, I know of the jail, which is very
16   little.
17        Q.   And the next finding says, "poorly-trained
18   staff."  Were you aware of that finding?  I'm still on
19   page three, the same paragraph.
20        A.   Yes, sir.
21        Q.   And would you agree with that finding?
22        A.   I wouldn't -- I wouldn't know if that were
23   the case.  That was what we were told.  I mean, I don't
24   know actually, because we were never privileged to the
25   training they received at the jail, other than what
```

```
 1   we've read in that report.
 2        Q.   And next, on that same line, it says,
 3   "limited supervision."  Were you aware of that
 4   finding?
 5        A.   If it would have been in the report, I would
 6   have read that.  I don't recall being knowledgeable of
 7   that, but if it was in a report, I would have read it.
 8        Q.   Would you agree or disagree with that
 9   finding, or have no opinion?
10        A.   No, sir, I have no opinion.  I wouldn't have
11   had the knowledge, other than this report, to know that
12   for a fact.
13        Q.   And then going to the next sentence -- not
14   "crowded conditions" -- but then, it says, "failure to
15   follow established policy and procedures."
16             Were you aware of that finding?
17        A.   Again, I read the report, yes, sir.
18        Q.   Turn to page four.  Go to the -- actually, it
19   will be the third paragraph, the part that starts with
20   "Staff should be held accountable."
21             Do you see that?
22        A.   Yes, sir.
23        Q.   Go to the second sentence.  "Retaining
24   personnel who are negligent in their duties and/or not
25   holding them fully accountable for their actions, does
```