1            UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                   SOUTHERN DIVISION

4

5    KASEY D. ALVES,

6            Plaintiff,

7        VS.                    CAUSE NO.: 1:06cv912 LG-JMR

8    HARRISON COUNTY MISSISSIPPI, BY AND
     THROUGH THE BOARD OF SUPERVISORS;
9    HARRISON COUNTY SHERIFF'S DEPARTMENT;
     SHERIFF GEORGE PAYNE, JR.; AND
10   HEALTH ASSURANCE, LLC.,

11           Defendants.

12

13                    DEPOSITION

14                        OF

15                  STEVE CAMPBELL

16           Taken on behalf of the Plaintiff

17          9:30 a.m., Monday, May 19th, 2008

18                      before

19            Lisa H. Brown, CSR #1166

20

21

22

23              COAST-WIDE REPORTERS
                   Court Reporters
24               Post Office Box 95
            Biloxi, Mississippi  39533-0095
25                 (228) 374-5066

PLAINTIFF'S
EXHIBIT
"53"
PENGAD-Bayonne, N.J.

1  red vest and help customers.

2      Q.    When did you retire from the sheriff's

3  department?

4      A.    Sir?

5      Q.    When did you retire from the sheriff's

6  department?

7      A.    I think the effective date was about the

8  middle of January.

9      Q.    '08?

10     A.    Yes, sir.

11     Q.    What was your position at the time you

12  retired?

13     A.    I was the director of professional standards

14  and had the rank of captain.

15     Q.    How long had you held that position?

16     A.    Since September 2002.

17     Q.    So from September 2002 until January of

18  2008, you held the same position with the sheriff's

19  department?

20     A.    That's correct.

21     Q.    Is September 2002 the first time you were

22  employed with the Harrison County Sheriff's

23  Department?

24     A.    Yes.

25     Q.    And where were you employed prior to that?

14

```
 1    had gotten shot in a shoot out, and he couldn't really
 2    get back to the street, so they assigned him to me.
 3         Q.   How long did Ron Werby work in that
 4    department?
 5         A.   I think he went over to the FBI task force
 6    in, I don't remember, sometime maybe -- 2005, maybe.
 7    I don't remember exactly when it was.  And he had come
 8    back -- after he went down to the FBI, he'd come back
 9    and help every once in a while if I had -- if I had a
10    whole lot to do.
11         Q.   So around sometime in 2005 is when he went
12    to the FBI?
13         A.   I think so.  It -- I'm guessing.  I think it
14    was.  I don't remember the exact date.
15         Q.   Okay.  And what were Mr. Werby's duties?
16         A.   He was -- he did applicant development,
17    background investigations, and he also did some
18    internal investigation.
19         Q.   Was your particular department responsible
20    for background investigations of applicants that
21    wanted to work with the sheriff's department?
22         A.   That's correct.
23         Q.   Generally, what was the process to do a
24    background investigation?
25         A.   Well, the application was completed and
```

1    turned in.  Well, we developed a new application

2    that's quite lengthy, and when it was turned in, there

3    was a -- there was an interview before the back -- a

4    pre-background interview.  And if that was

5    satisfactory on the part of the applicant, then a

6    background investigation was initiated and which

7    entailed investigation of the applicant's background,

8    previous employment, references, neighborhood checks,

9    criminal background, things like that.

10        Q.   Do you know if previous employers were

11   contacted by your department?

12        A.   Yes.

13        Q.   And would a record be kept of those

14   contacts?

15        A.   I would guess -- I don't know where they

16   are.  I guess they're still there.

17        Q.   But would it be usual to keep a record of

18   whatever contacts you made concerning that?

19        A.   That's correct.

20        Q.   Maybe some type of note or report concerning

21   those contacts?

22        A.   And we had some -- we had some forms, and

23   they would be filled out and completed by the guy

24   doing the background.  And then after the background

25   was completed, then it was -- if it was an enforcement

1    do criminal investigations.

2        Q.    So if there was an indication that a crime

3    had been committed, that would be referred to who?

4        A.    That would be the criminal investigation

5    division.

6        Q.    Of the sheriff's department?

7        A.    Correct.

8        Q.    During the time you served as head of the

9    professional standards unit at the sheriff's

10   department, do you ever remember making a referral to

11   the criminal investigation unit concerning a law

12   enforcement officer?

13       A.    No.  Now, I met -- I would refer them -- I

14   would call either -- the state sometimes.  At the

15   direction of the sheriff, I'd call the district

16   attorney's office or the FBI, but as far as calling

17   our CID, no.

18       Q.    So there were occasions when you called

19   either the highway patrol or the district attorney's

20   office?

21       A.    I didn't call highway patrol.

22       Q.    Okay.  How about the district attorney's

23   office?

24       A.    Yes.  I said the district attorney or the

25   U.S. Attorney -- or the -- excuse me, the FBI.

1      Q.    Would there be a file established in the

2    officer's name who is being investigated?

3      A.    Yes.

4      Q.    When the Department of Justice obtained

5    these records, did the sheriff's department keep a

6    copy of them?

7      A.    No.

8      Q.    And was this procedure followed during the

9    time that you were the head of the professional

10   standards unit?

11     A.    Yes.

12     Q.    And if there was any discipline or any

13   action taken against an officer, would it also be

14   maintained in your office what that was?

15     A.    Sometimes -- sometimes I didn't even know.

16   I wasn't part of the disciplinary process.

17     Q.    Who would handle the discipline?

18     A.    Well, I would turn my findings with the

19   reports over to the sheriff.  And if he decided that

20   discipline may be in order, he would refer it to --

21   excuse me.  There was a committee.  I guess you'd call

22   it a committee or a board that was comprised of the

23   warden, Wayne Payne, who was over the enforcement, and

24   Richard Smith was over administration.  And the

25   employee would be given a notice of a hearing.  The

1      A.    Well, the discipline was done by the
2  sheriff.  The board made recommendations.  Sometimes
3  he followed their recommendations.  Sometimes he
4  didn't.
5      Q.    So, to your knowledge, the board would issue
6  a recommendation and that would be sent to the
7  sheriff?
8      A.    Correct.
9      Q.    And the sheriff would determine what, if
10  any, discipline would be applied?
11      A.    That's correct.
12      Q.    In your investigations that you conducted of
13  employees, those were always given to the sheriff?
14      A.    Yes.
15      Q.    And those reports given to the sheriff were
16  maintained as part of the records you maintained in
17  your office?
18      A.    Yes.
19      Q.    Who was your supervisor when you were head
20  of the professional standards unit?
21      A.    Sheriff Payne.
22      Q.    Okay.  What type of referrals did your unit
23  receive as far as being asked to do investigations?  I
24  mean, were they from individuals, from the --
25      A.    They came from the sheriff.

1        Q.    The sheriff.  Okay.  So each time that your

2    unit was asked to investigate a particular complaint,

3    that would be initiated by the sheriff?

4        A.    That's correct.

5        Q.    And how would the sheriff initiate that

6    request for an investigation?  Was it in writing?

7    Oral?  How was that done?

8        A.    He'd call me in his office and refer it to

9    me.  Sometimes there were already reports made by --

10   well, just about all the time, there were already

11   reports made by whichever department was involved.

12   And they were forwarded to the sheriff, and he either

13   would give them to me or he'd tell me where to go get

14   them.

15       Q.    And you're talking about Sheriff Payne?

16       A.    Yeah.

17       Q.    George Payne?

18       A.    Yeah.

19       Q.    Were referrals given to you by anyone else

20   in the sheriff's department, other than Sheriff Payne?

21       A.    No.  Or he may say, go see Wayne Payne, he's

22   got something for you, and they've already talked

23   about it, but I would always go back to him and

24   confirm that.

25       Q.    But the sheriff initiated it, even if he

COAST-WIDE REPORTERS

1       A.    Yes.

2       Q.    And those tapes were maintained, also?

3       A.    Yes, sir.

4       Q.    If there were any complaints made against

5    correction officers, were the videos and the -- well,

6    were there videos usually available in the jail?

7       A.    Some of them were.  Some places were.

8            MR. GEWIN:  Are you speaking of the actual

9       interview, Woody?

10           MR. PRINGLE:  No.

11   BY MR. PRINGLE:

12      Q.    When there was an allegation of an alleged

13   misconduct that allegedly occurred in the jail, are

14   there cameras in the jail to record what goes on in

15   the jail?

16      A.    At some places there are.

17      Q.    Okay.  Are there cameras in the booking

18   area?

19      A.    Yes, there were.

20      Q.    During the time that you were there?

21      A.    Yes.

22      Q.    And if there was an allegation against a

23   booking officer, would you review the videos?

24      A.    I would.

25      Q.    Would you ever review the videos with the

COAST-WIDE REPORTERS

1  booking officer there?

2       A.   I may have on occasion, but more times than

3  not, now I don't think so, unless -- I probably -- I

4  know I did a few times, but it wasn't like every time.

5       Q.   On the occasions that you would have the

6  booking officer there to review the video, why would

7  you do that?

8       A.   I just decided to.  For whatever reason I

9  decided to, and maybe so they could explain something

10  to me or something like that, or I could hammer a

11  point home to them.

12       Q.   Were all the areas in the booking area

13  covered by videos, video cameras?

14       A.   There was one place that was in the shower

15  where they changed, where they changed clothes.  There

16  was no camera inside there.  There was a camera that

17  showed the door, but when the door was closed, you

18  know, you couldn't see in there.

19       Q.   And there were videos in all the holding

20  cells in the booking area?

21       A.   Well, they didn't cover all the holding

22  cells.  I think there might have been two of them like

23  where they kept the females.  But you could -- there

24  were -- there were cameras on either end where you

25  couldn't see directly inside of them, but you could

1    you when you interviewed the officer?

2        A.    Rarely.  It would be maybe the other

3    investigator, either Werby or McMahan.  They just may

4    -- they may just sit in there, but not participate.

5        Q.    Would it normally just be you and the

6    officer?

7        A.    Yes, sir.

8        Q.    Okay.  You recorded the interviews audibly

9    -- through an audiotape?

10       A.    Yes, sir.

11       Q.    Did you ever videotape interviews of the

12   officers?

13       A.    No.

14       Q.    Did you ever video interview any of the

15   complaining individuals or witnesses?

16       A.    No.

17       Q.    How did you keep the sheriff advised of your

18   investigations?

19       A.    I'd go in his office and tell him, or when

20   -- if I had my reports complete and all that, I'd go

21   in there and discuss it with him, tell him what I

22   found and gave him a copy of the report.

23       Q.    Were there times that you discussed with the

24   sheriff the investigation as you were in progress?

25       A.    Sometimes, yes.

1          Q.    Okay.   That would be made part of your
2     record, the inmate's grievance?
3          A.    Yes.
4          Q.    When Don Cabana was appointed warden of the
5     jail, did you meet with Mr. Cabana?
6          A.    Yes.
7          Q.    Were there any particular changes that he
8     made that had any affect on your office?
9          A.    No.
10          Q.    Do you know if Mr. Cabana continued the use
11     of the restraint chair after he was appointed the
12     warden?
13          A.    It's my understanding he stopped the use of
14     the restraint chair.
15          Q.    In holding cell five in the jail, was there
16     a bench with leg and handcuff restraints kept in
17     there?
18          A.    There was one that had that.   That's
19     correct.
20          Q.    Whether it was five or whatever, there was
21     one designed for that particular purpose in a holding
22     cell?
23          A.    That's correct.
24          Q.    Did you ever investigate any complaints by
25     any detainees or inmates concerning that particular

1      Q.   I want to go back to that holding cell,

2   whether it's holding cell five or whatever number it

3   is.

4           Did you make investigation concerning an

5   inmate by the name of Robert Lewis back on September

6   12, 2005 where it was alleged he was held in

7   restraints for twenty-four hours?

8      A.   No.

9           MR. GEWIN:   What was that name, again,

10      Woody?

11          MR. PRINGLE:   Robert Lewis.

12     A.   I don't remember that.

13  BY MR. PRINGLE:

14     Q.   Do you recall an incident involving Rick

15  Gaston?  And, again, the dates you may not recall.   It

16  would have been October 10, 2003, where he allegedly

17  assaulted Timothy Oliver in the presence of two

18  Baldwin County, Alabama correctional officers.

19     A.   I remember that incident.

20     Q.   Was an investigation made?

21     A.   I was made aware of that by the sheriff

22  about a year after that happened, after he filed a

23  lawsuit, and I did an investigation on it, I did.

24     Q.   That would have been after Mr. Oliver filed

25  a lawsuit?

```
 1         A.    That's correct.
 2         Q.    What was the result of that investigation,
 3   if you remember?
 4         A.    Well, I didn't find any wrongdoing on the
 5   part of Gaston.  There were witnesses there.  The
 6   Baldwin County guys never said anything until -- I
 7   think until 2006.
 8         Q.    Did you interview the Baldwin County
 9   officers?
10         A.    No.  No, I did not.
11         Q.    Was there information available to you to
12   interview them?
13         A.    No.  I didn't even know about it.  I'm think
14   in the trial their credibility was questionable at
15   best.
16         Q.    Was there a video available of that alleged
17   assault on Mr. Oliver?
18         A.    No.
19         Q.    In July of 2006, did you investigate an
20   incident or a claim that booking officers had erected
21   a memorial to Insect Bill?
22         A.    To what?
23         Q.    Insect Bill.
24         A.    No, I never heard of that.
25         Q.    You never heard of that?
```

```
 1        A.    No.
 2        Q.    Did you investigate, in July of 2006, Deputy
 3   Stolze' cartoon of June bug?
 4        A.    No.
 5             MR. PRINGLE:  Go off the record for a
 6        minute.
 7                        -  -  -
 8                  (Off the record.)
 9                        -  -  -
10   BY MR. PRINGLE:
11        Q.    I want to go back to something you've talked
12   about a little bit ago.  It's an incident involving
13   six officers and -- five or six officers and one
14   inmate you said was directly related to Deidre
15   Caldwell; is that correct?
16        A.    I didn't say the inmate was related to
17   anybody.  I don't know who you're talking about.
18        Q.    Okay.  Ms. Caldwell was terminated as a
19   result of that incident.
20        A.    Oh, okay.  Uh-huh (indicating yes).
21        Q.    Forgive my phrasing.
22        A.    Okay.
23        Q.    All right.  And then another -- someone else
24   was terminated that had been there just for a period
25   of time; is that correct?
```

1        A.    That's correct.

2        Q.    All right.  Do you remember how that was

3    brought to your attention that that occurred?

4        A.    No, I don't.

5        Q.    Do you remember if written reports were

6    submitted by the officers concerning that incident?

7        A.    I'm sure there were.

8        Q.    At the Harrison County Detention Facility,

9    there was a -- at some point, there were contract

10   medical services provided by a company, and they

11   employed nurses that worked at the jail; is that

12   correct?

13       A.    Yeah.  Health Assurance was awarded a

14   contract by the Board of Supervisors after -- I can't

15   remember the name of that other company that left.

16   And I don't remember when it was.

17       Q.    During the time that Health Assurance had

18   the contract and you were working there, did any of

19   their nurses ever make any complaints to you about

20   abuse occurring in the jail by booking officers?

21       A.    No.

22       Q.    The company that was there before Health

23   Assurance, did any of the nurses that worked for that

24   company make any complaints to you concerning abuse by

25   officers toward detainees or inmates?

1      A.   No.

2      Q.   Were any written reports ever submitted to

3  you by any nurses of Health Assurance concerning their

4  observations of alleged abuse towards detainees or

5  inmates?

6      A.   I don't believe so.

7      Q.   Do you ever remember making an investigation

8  of alleged abuse of an inmate by the name of Johnny

9  O'Bryant?

10     A.   Yes.  That was the one with Karl Stolze.

11     Q.   Is that the incident you described earlier

12  where he grabbed him by the throat?

13     A.   Yes.

14     Q.   And was Mr. Stolze disciplined?

15     A.   Yes.  The sheriff let him resign.

16     Q.   So this would have occurred after the Jessie

17  Lee Williams incident?

18     A.   I think so.  Yeah, I think so.

19     Q.   Did you do an investigation of the death of

20  Lee Demond Smith which occurred in December of 2005?

21     A.   No.

22     Q.   Did you ever do an investigation of alleged

23  abuse of John Hale?

24     A.   No.

25     Q.   Did you do an investigation of alleged abuse

1  of Alonzo Reeves?

2       A.    No.

3       Q.    Are you aware of complaints by Mr. Reeves?

4       A.    No.

5       Q.    Did you ever make an investigation of

6  alleged abuse of an inmate by the name of Only Al

7  Kahidir?

8       A.    No.

9       Q.    Did you ever see Mr. Kahidir's photographs

10  from the booking room?

11       A.    I saw them in the paper.

12       Q.    That's the first time you saw them?

13       A.    Yeah.

14       Q.    Was there any procedure set up where your

15  office or anyone else would review the digital tapes

16  or VHS tapes from the booking area on a daily basis?

17       A.    No.  I would just view them every once in a

18  while just to look at them.  Matter of fact, we got --

19  one officer was terminated -- I would just -- for

20  abuse.  I was just looking at -- I happened to be just

21  -- queried up some tapes and was watching it, and this

22  guy went in the holding -- an officer went in the

23  holding cell and slapped some inmate.

24       Q.    So the only time you would review the tapes

25  or the digitals would be if there was a complaint

74

1    made?

2        A.    Yeah, usually.  I mean, sometimes I'd just

3    look at them.  If I had some slack time, I'd look at

4    them to see what was going on down there.

5        Q.    Okay.  Did you ever investigate the alleged

6    abuse of Ralph Floyd?

7        A.    No.

8        Q.    Did you ever investigate the alleged abuse

9    of David Eustice?

10       A.    No.

11       Q.    Did you ever investigate the alleged abuse

12   of Abra (phonetic) Horne?

13       A.    Was she a mental patient?

14       Q.    It would have been alleged against

15   Mr. Gaston.

16       A.    I remember I assigned Werby to do an

17   investigation of some woman that was there as a mental

18   patient, but they just -- I don't know.  Maybe it

19   wasn't her.  I don't remember.

20       Q.    Did you ever investigate the alleged abuse

21   of Larry McDougle (phonetic)?

22       A.    No.

23       Q.    Did you ever investigate the alleged abuse

24   of Angela Rich?

25       A.    No.

1      Q.  Did you ever investigate the alleged abuse

2  of Smokey Joe Wilson?

3      A.  I did.

4      Q.  What was that about?

5      A.  He had -- Gulfport Police Department had

6  brought him in hog tied. He was fighting them.  I

7  think it was late at night whenever they brought him

8  in and they had him hog tied.  And he came in.  He had

9  a big whelp on the side of his head, and he was

10 intoxicated, I think.  Best I can remember, he was

11 pretty intoxicated.  And, anyway, they took him in the

12 shower to dress him out and he -- when they took his

13 handcuffs off and undid him, he decided he wanted to

14 fight, and they had to fight him.

15     And I saw him the next -- I just happened to

16 see him the next morning.  I was walking downstairs

17 and there was this guy with a whelp on the side of his

18 head.  And I asked him what happened, and he said a

19 Gulfport police guy had beat him up.  And it seems

20 like later on that day, there was a complaint that I

21 think Gulfport professional standards unit called me

22 and said they had some reports from their officers

23 that said he got beat up at the jail.  And, anyway, I

24 did an investigation on that.

25     Q.  What was the result of your investigation?

1       A.    Well, it was -- it was -- it wasn't -- it

2   wasn't concluded.   The allegations were unfounded.

3   Gulfport -- if you read those Gulfport officers'

4   reports, they just -- there was a lot of deception in

5   those reports.

6       Q.    Well, you said that he was taken into the

7   shower to be dressed out, and they had to fight him in

8   the shower.   Who had to fight him in the shower?

9       A.    I think it was Necaise, Evans.   I don't

10  remember one other officer.

11      Q.    And they were sheriff department employees?

12      A.    Yes.

13      Q.    Did those officer complete reports about

14  what had happened?

15      A.    They did.   I interviewed Wilson, too.

16      Q.    Did they do reports before or after they

17  talked to you?

18      A.    Before.   I didn't take reports after I

19  interviewed them.

20      Q.    Okay.   All right.   Did you investigate the

21  allegation of abuse concerning Michael Newton?

22      A.    No.

23      Q.    Did you investigate the abuse concerning an

24  individual by the name of Edward Carver?

25      A.    No.

77

1          Q.   Did you investigate abuse of an individual
2    by the name of Tracy Varner?
3          A.   No.
4          Q.   Did you investigate abuse -- alleged abuse
5    of an individual by the name of Donald Williams?
6          A.   No.
7          Q.   Did you investigate abuse of an individual
8    -- the alleged abuse of an individual by the name of
9    Michael Wilson?
10         A.   No.
11         Q.   Did you investigate the alleged abuse of an
12   individual by the name of Ahn Tran, A-H-N, last name
13   T-R-A-N?
14         A.   No.
15         Q.   Instead of just repeating the question, I'm
16   just going to ask you the individual's name, so we can
17   get moving.
18         A.   Okay.  Okay.  That's fine.  Okay.
19         Q.   How about Ronald Rouse?
20         A.   No.
21         Q.   Daniel Howard?
22         A.   No.
23         Q.   Daniel Alonzo?
24         A.   No.
25         Q.   Ray Elder?

```
 1        A.   No.

 2        Q.   Jay Aldrich, A-L-D-R-I-C-H?

 3        A.   No.

 4        Q.   Billy Nash?

 5        A.   No.

 6        Q.   Jeffrey Lee Pierce?

 7        A.   No.

 8        Q.   Johnny Lee Calcote, C-A-L-C-O-T-E?

 9        A.   No.

10        Q.   Wyman, W-Y-M-A-N, HUSLEY, H-U-S-L-E-Y?

11        A.   No.

12        Q.   John Hoffmann?

13        A.   No.

14        Q.   Robert Lewis was the individual we talked

15   about earlier about the restraints.

16        A.   No.

17        Q.   Okay.  Richard Smith?

18        A.   No.

19        Q.   Gregoire Van Develde?

20        A.   No.

21        Q.   G-R-E-G-O-I-R-E.  Last name, V-A-N

22   D-E-V-E-L-D-E.  No?

23        A.   No.

24        Q.   Okay.  Myrthis Horn, M-Y-R-T-H-I-S Horn?

25        A.   No.
```

```
1        Q.   Michael Kiser, K-I-S-E-R?

2        A.   No.

3        Q.   Jessie Rodriquez?

4        A.   No.

5        Q.   John Barnes?

6        A.   John Barnes.  I don't think so.

7        Q.   Adar Cooley?

8        A.   I don't think so, no.

9        Q.   Christopher Windell, W-I-N-D-E-L-L?

10       A.   No.

11       Q.   James Farrow, F-A-R-R-O-W?

12       A.   Yes.  Yes.

13       Q.   Okay.  What was that about?

14       A.   He was -- during the -- I don't remember

15  when this was.  This was in 2000 -- it might have been

16  2005, maybe.  He had -- during the -- I think during

17  the evening shift, like the 3:00 to 11:00 shift, he

18  attacked an officer and worked him over pretty good.

19  Okay?

20       Q.   Okay.

21       A.   So the midnight shift came on, and a bunch

22  of the officers took him out in the recreation yard

23  and screamed and hollered at him, okay, and then took

24  him back.  Well, he filed a complaint that he was beat

25  up, okay.  So I got him to -- I got him to write me a
```

1  person you're arresting or the inmate or whatever the

2  case may be.

3        Q.    Okay.   So there's a force continuum.   Can

4  you explain what you mean about that?

5        A.    Yes.   It's an escalation of force.   And I

6  think there's six or seven.   And the criteria starts

7  with just the officer present, and it escalates up to

8  putting your hands on someone, using a -- using a -- I

9  forget what they call it, something like a -- like a

10  baton.   It goes up there.   And then the last is deadly

11  force.

12        Q.    Is this force continuum given to Harrison

13  County sheriff's officers in writing?

14        A.    Yes.   It's in --

15        Q.    Or are they trained -- it's in writing?

16        A.    It's in the general orders.

17        Q.    Okay.   And it's also part of their training?

18        A.    Yes, sir.

19        Q.    Okay.   I want to go over some of these

20  officers with you and ask you about whether or not you

21  conducted any investigation of these officers while

22  you were head of the professional standards unit.

23                Did you ever conduct an investigation of

24  Ryan Teel?

25        A.    I did.

1      Q.    On more than one occasion?

2      A.    I think twice.

3      Q.    Twice?

4      A.    Not counting Jessie Lee Williams.

5      Q.    Okay.  If we counted Jessie Williams, that

6   would be three?

7      A.    Wait a minute.  There was -- no, I think

8   there was three others.  There was an investigation

9   where he released the wrong person.  He was

10   disciplined for that.  There was an allegation of he

11   and another officer beat up this inmate.  That was

12   unfounded, because the witnesses changed their story.

13   And Kasey Alves, he was a part of that.

14      Q.    Did you interview Mr. Teel concerning

15   Mr. Alves?

16      A.    I did.

17      Q.    Did you record that interview?

18      A.    I did.

19      Q.    Did you do the interview?

20      A.    I did.

21      Q.    Did Mr. McMahan also interview Mr. Teel?

22      A.    No.

23      Q.    Mr. McMahan interviewed some other

24   individuals; is that correct?

25      A.    McMahan.  McMahan.

1       Q.    McMahan?

2       A.    Yeah.  He interviewed some of the other

3   officers that were down there.

4       Q.    Other than Ryan Teel, what other officers

5   did you investigate -- I mean, interview concerning

6   Kasey Alves, if you recall?

7       A.    I don't remember.  I interviewed some of the

8   other ones.  McMahan did some of them, and I did some

9   of them.

10      Q.    And all those interviews would have been

11  recorded, to your knowledge?

12      A.    They were all recorded.

13      Q.    Did you interview Mr. Alves?

14      A.    No.

15      Q.    Did you interview Mr. Manning, the Biloxi

16  officer who brought Mr. Alves in?

17      A.    No.

18      Q.    So the only time that Mr. Teel was

19  disciplined, to your knowledge, was when he let the

20  wrong inmate leave the jail; is that right?

21      A.    That's correct.  Well, he was disciplined.

22  I think he resigned after the Jessie Williams' deal.

23  I don't know.  The sheriff might have terminated him,

24  I don't know, but that or he resigned.

25      Q.    Do you know if Mr. Teel was asked to resign?

COAST-WIDE REPORTERS

1      A.    I don't know.

2      Q.    You didn't ask him to resign?

3      A.    No.

4      Q.    Did you ever investigate Regina Rhodes?

5      A.    Yes.  She was part of -- I think I

6  interviewed her on this Jessie Williams' incident and

7  -- yeah, I inter- -- the Department of Justice let me

8  -- I think, let me interview her, and she was

9  terminated.

10     Q.    And that was following the Jessie Williams

11 incident?

12     A.    Yes, sir.

13     Q.    Did you investigate her for anything else

14 prior to the Jessie Williams case?

15     A.    Yes.  She was -- that guy, that Nguyen guy

16 said that -- had alleged that she was taunting his

17 wife, and I interviewed her about that.

18     Q.    Was she disciplined?

19     A.    No, she didn't do it.

20     Q.    Any other investigations of Regina Rhodes

21 that you can remember?

22     A.    I think that's all.

23     Q.    Investigations of Morgan Thompson, I think

24 we talked about one earlier with --

25     A.    Uh-huh (indicating yes).

COAST-WIDE REPORTERS

92

```
1    what we've talked about?
2         A.   No.  No, you're right.  I'm sorry.  I'm
3    sorry.  Go ahead.  I'm sorry.
4         Q.   Any others concerning Daniel Evans?
5         A.   No.
6         Q.   Okay.  What about Karl Stolze?  I think we
7    talked about one earlier.  Any other ones concerning
8    Mr. Stolze?
9         A.   He was on the Smokey Wilson deal and on the
10   Johnny O'Bryant.  That's the only ones I can remember
11   about him.
12        Q.   He was also disciplined for Kasey Alves; was
13   he not?
14        A.   Oh, I'm sorry.  Yeah.  He was -- he was
15        Q.   Was Mr. Stolze --
16        A.   And Evans was, too, on Kasey Alves.
17        Q.   All right.  Okay.
18        A.   Sorry.
19        Q.   That's all right.  Was Mr. Stolze involved
20   at all in the Jessie Lee Williams' case?
21        A.   No.  No.
22        Q.   Was Mr. Stolze disciplined at all concerning
23   any of his conduct after Jessie Lee Williams' death?
24        A.   I think the Johnny O'Bryant incident was
25   after Jessie Lee Williams.
```

1    A.   I don't know.  I just know Priest, because I

2    referred that back to the warden, and she disciplined

3    him for that.

4    Q.   Were Ryan Teel, Regina Rhodes, Morgan

5    Thompson, Deidre Caldwell, Preston Wills, Daniel

6    Evans, Karl Stolze, William Priest, Timothy Moore or

7    Roderick Fulton ever disciplined for filing false or

8    fraudulent use of force forms?

9    A.   No, not that I know of.

10    Q.   Were you aware of a meeting that occurred

11    with booking officers on April 20th, 2005 concerning

12    the use of force in the booking area?

13    A.   I knew about it after the fact.

14    Q.   What did you learn about it?

15    A.   I just knew they had a meeting.  And I think

16    I read a memo that Diane Riley put out after that

17    meeting.  And I don't -- it wasn't a meeting about use

18    of force.  I think it was conduct towards inmates, I

19    think, or something like that.  It wasn't designated a

20    use of force meeting, I don't believe.

21    Q.   Do you remember the memo containing this,

22    that cussing, shouting, taunting and mistreatment of

23    arrested individuals will get you fired.  It stops

24    today.  Do you remember her saying that?

25    A.   I think -- yeah, I think that Richard Smith,

1    that was what he said.  He was in the meeting, too.  I

2    think that was in the mem- -- that came from him.

3         Q.    Richard Smith?

4         A.    Uh-huh (indicating yes).

5         Q.    And what was Mr. Smith's job at that time?

6         A.    He was over administration.

7         Q.    Were you ever present when Rick Gaston spoke

8    to booking officers in the booking area about how to

9    use force in front of the cameras?

10        A.    How to do what?

11        Q.    Use force in front of the cameras.

12        A.    No.

13        Q.    Were you present when he allegedly

14   instructed booking officers that an individual talking

15   with his hands and throws his hands in the air, you

16   can duck out of the way and pretend like he's trying

17   to strike you?

18        A.    No.

19        Q.    You weren't present for that conversation?

20        A.    No.

21        Q.    Were you aware of the terms that the booking

22   officers allegedly used for certain days of the week?

23        A.    No.

24        Q.    You weren't aware of the term, "Thump a Thug

25   Thursday"?

```
 1        Q.   What is the policy of the use of OC -- or
 2   what was the policy, while you were there, of the use
 3   of OC spray on restrained inmates or detainees?
 4        A.   On restrained inmates?
 5        Q.   Yes, sir.
 6        A.   If an inmate is truly restrained, I would
 7   think it's a violation of policy.
 8        Q.   What's the tactical -- do you know what a
 9   tactical swipe is of OC spray?
10        A.   Yes.
11        Q.   What is that?
12        A.   It's when an officer sprays OC spray in his
13   hand and he wipes it on the face.  And that's a tactic
14   that's taught in the OC class.
15        Q.   And when is that to be used?
16        A.   I just know it's taught in the class.
17        Q.   Is the tactical swipe to be used on a
18   restrained inmate or detainee?
19        A.   No.  I think it's used if there's other
20   officers around and they may get some of the spray on
21   them, so they spray it on their hand.
22        Q.   But if an inmate or detainee is restrained
23   with handcuffs behind his back, is an officer to use
24   the tactical swipe?
25        A.   Well, if you're referring to your client
```

1   detainees?

2        A.   No.

3        Q.   Do you know what a vascular neck restraint

4   is?

5        A.   I think so.

6        Q.   What is your understanding of what that is?

7        A.   I think it's when the front of the neck is

8   put in a restraint where it's the inside of the elbow,

9   and squeezed, where I think it squeezes those veins

10  there and causes someone to pass out.

11       Q.   Is that a technique that's taught or was

12  taught by the Harrison County Sheriff's Department?

13       A.   No, no.

14       Q.   Is it a technique that the Harrison County

15  Sheriff's Department approved?

16       A.   No.

17       Q.   So, if used, that would be against the

18  policy or procedures of the Harrison County Sheriff's

19  Department?

20       A.   That's correct.

21       Q.   Did anyone ever complain that you're aware

22  of that Ryan Teel had used the vascular neck restraint

23  against inmates or detainees?

24       A.   No.

25       Q.   I know I may have asked you this, but did

COAST-WIDE REPORTERS