```
 1   Timothy Brandon Moore.
 2                    TIMOTHY BRANDON MOORE
 3   was thereupon called as a witness for and on behalf of the
 4   government and, having been duly sworn, testified as follows:
 5                         DIRECT EXAMINATION
 6   BY MR. RICHMOND:
 7   Q.   Good afternoon, Mr. Moore.  Could you introduce yourself
 8   to the jury?
 9   A.   My name is Timothy Brandon Moore.  I'm 26 years old.  From
10   Gulfport.
11   Q.   Mr. Moore, where do you currently work?
12   A.   For Ball Heating & Air in Biloxi.
13   Q.   Did you used to work at the Harrison County Adult
14   Detention Center?
15   A.   Yes.
16   Q.   When did you work there?
17   A.   About 2002 until 2005.
18   Q.   Why did you decide to work at the jail?
19   A.   My father was a policeman.  My uncles.  My grandma worked
20   in records at the jail.  And it was just kind of a family
21   thing.
22   Q.   When you began your work at the jail, where were you first
23   assigned?
24   A.   To work the blocks on shift.
25   Q.   Did you work in the blocks during your entire time at the
```

```
 1    Q.   Did you receive training in handcuffs?
 2    A.   Yes.
 3    Q.   Were you certified in OC spray?
 4    A.   Yes.
 5    Q.   And being instructed in OC spray, did you learn when to
 6    spray people and when not to spray people?
 7    A.   Yes.
 8    Q.   Have you been certified in the taser?
 9    A.   No.
10    Q.   Are you familiar with the jail's use of force policy?
11    A.   Yes.
12    Q.   How did you become familiar with it?
13    A.   In the 40 hour training, the 80 hour training and
14    different other times during shift briefing, it was gone over.
15    Q.   In your experience, was it the practice of the booking
16    officers to comply with that policy?
17    A.   No.
18    Q.   Were you present at a meeting April 20th, 2005, with the
19    booking staff?
20    A.   Yes.
21    Q.   Who else was at that meeting?
22    A.   Major Smith, all of the shift sergeants and a few other
23    people.  There were a lot of people there.
24    Q.   What was the topic of that meeting?
25    A.   It was basically to blast booking.  It was aimed at the
```

```
 1   excessive force being used.
 2   Q.  Was Defendant Gaston present during that meeting?
 3   A.  Yes.
 4   Q.  Was Defendant Teel present during that meeting?
 5   A.  Yes.
 6   Q.  Do you recall how Defendant Gaston responded during that
 7   meeting?
 8   A.  He wasn't very worried about it.
 9   Q.  After the meeting, did you have an opportunity to speak
10   with Captain Gaston?
11   A.  No.
12   Q.  Did you observe Captain Gaston's reaction after the
13   meeting?
14   A.  Yes.
15   Q.  And what was his reaction?
16   A.  It wasn't a big deal.  It was -- there was no concern.
17   Q.  Did you notice any changes to the booking officers' habits
18   following the meeting?
19   A.  No.
20   Q.  You said there were accusations of excessive force or
21   mistreatment.  Were booking officers mistreating people at the
22   jail?
23   A.  Yes.
24   Q.  Does that include Defendant Teel?
25   A.  Yes.
```

1  brachial plexus strike, things like that.
2  Q.  You mentioned a brachial plexus strike.  What is a
3  brachial plexus strike?
4  A.  A strike to the neck.
5  Q.  Is that an approved law enforcement tactic?
6  A.  I don't remember.  I really don't remember a lot about
7  PPCT.
8  Q.  Would officers compare their reports before submitting
9  them?
10 A.  Yes.
11 Q.  And who would they submit their reports to, the booking
12 officers?
13 A.  Captain Gaston.
14 Q.  How did you know that booking officers didn't have to
15 follow the jail's policy regarding report writing?
16 A.  No one did.  It was just understood.  It was common
17 practice.  It was a daily thing.
18 Q.  Were you aware that there were video cameras in booking?
19 A.  Yes.
20 Q.  Did the booking officers have discussions about those
21 video cameras?
22 A.  Yes.  Captain Gaston said several times, if you have to do
23 anything, do it off camera, in the shower or in the hallway.
24 Q.  And what was --
25 A.  The cameras were our enemy.

```
 1   Q.   What was the context of those conversations?
 2   A.   Using force against inmates.
 3   Q.   Were other officers present with you and Defendant Gaston
 4   when he made those statements?
 5   A.   Yes.
 6   Q.   Was Defendant Teel present?
 7   A.   I don't remember.
 8   Q.   Have you heard similar statements from Defendant Teel?
 9   A.   Yes.
10   Q.   Did booking officers make up names for days of the week?
11   A.   Thump a Thug Thursday, Fight Night Friday, Slap a Ho
12   Saturday.
13   Q.   Did you hear these names from Defendant Teel?
14   A.   Yes.
15   Q.   Did you hear them from other booking officers?
16   A.   Yes.
17   Q.   Did you ever hear Defendant Gaston talking about kicking
18   ass in booking?
19   A.   Yes.  Kicking ass and not taking names.
20   Q.   When he said kicking ass and not taking names, how did you
21   interpret that?
22   A.   That we were using excessive force and not writing
23   reports.
24   Q.   Was it clear that booking ran by Gaston's rules?
25   A.   Absolutely.
```

```
 1    Q.   What was the inmate's demeanor?
 2    A.   He just laid there.  He was in severe pain.
 3    Q.   What was Defendant Teel's demeanor at the time?
 4    A.   He was laughing and joking about it.  He said, "I got him
 5    in the gooch."  And he said it smelled like burning hair and
 6    hot dogs.
 7    Q.   How did other officers in the booking department respond?
 8    A.   They were laughing and egging him on.
 9    Q.   Were there times when individuals -- female individuals
10    would be in the shower and be reluctant to remove their
11    clothing?
12    A.   Yes.
13    Q.   Did you ever hear Defendant Teel encourage other officers
14    to use force during those times?
15    A.   Yes.  He would yell into the shower:  "Spray the bitch."
16    Q.   And when Defendant Teel would yell in, would he be able to
17    see if force was needed?
18    A.   No.
19    Q.   Did other officers join in that chant?
20    A.   Yes.
21    Q.   Who would they be yelling at?
22    A.   Whoever was in the shower with the inmate.
23    Q.   What would happen if the officer chose not to use OC spray
24    against the female who was undressing?
25    A.   Would be known as an inmate lover.
```

MARGARET WASMUND, RMR, CRR