1171

1   **MS. KRIGSTEN:** Your Honor, the government calls
2   Morgan Thompson.
3                           * * * * *
4                      MORGAN THOMPSON
5   was thereupon called as a witness for and on behalf of the
6   government, and, having been duly sworn, testified as follows:
7                    D I R E C T   E X A M I N A T I O N
8   **BY MS. KRIGSTEN:**
9   Q   Will you please state your name for the jury.
10  A   Morgan Lee Thompson.
11  Q   Mr. Thompson, how old are you?
12  A   Thirty years old.
13  Q   Where do you currently reside?
14  A   Wiggins, Mississippi.
15  Q   Are you currently employed?
16  A   Yes, ma'am.
17  Q   How are you employed?
18  A   Retail.
19  Q   What kind of retail?
20  A   I would rather not say.
21  Q   Were you previously employed at the Harrison County
22  Sheriff's Department?
23  A   Yes, ma'am.
24  Q   When did you begin your employment with the Sheriff's
25  Department?

EXHIBIT "8"

1   A   They teased me a lot about hitting in the face, the green
2   light/red light thing I am sure everybody has heard about,
3   hitting them in the face, leaving marks.
4   Q   What is the green light/red light thing?
5   A   Red light is anywhere that anybody can see marks, face,
6   arms, anything that is not covered by a county jumpsuit. A
7   green light is anything that can be covered and then you
8   wouldn't be able to see outright.
9   Q   Was red light/green light something that the booking
10  officers talked about?
11          **MR. DAVIS:**  Objection to leading.
12          **THE COURT:**  Objection as to leading is sustained.
13  **BY MS. KRIGSTEN:**
14  Q   Who, if anyone, would talk about red light/green light?
15  A   Booking officers.
16  Q   How would they talk about it?
17  A   Just like I said. They would tell you not to hit anybody
18  in the face. That would be red light. Green light, in the
19  body, anything that is covered.
20  Q   What is the professional standards unit?
21  A   It is Internal Affairs pretty much.
22  Q   And do you know who was in charge of Internal Affairs?
23  A   I believe it was Captain Steve Campbell.
24  Q   Were you ever investigated by Internal Affairs for your
25  actions towards Only Al-Khidir?

1   A    I don't believe I was. I turned in a narrative, a report,
2   and put it under his door. I don't recall ever speaking to him
3   about it.
4   Q    Were you concerned about an investigation into your
5   actions?
6   A    Yes, ma'am.
7   Q    Why?
8   A    Because I had gone beyond what I needed to do. It was
9   excessive force.
10  Q    Had you ever had a conversation or overheard -- let me ask
11  this a different way. Had you ever heard Steve Campbell make
12  any comments about how to write reports?
13              MR. DAVIS: Objection, Your Honor. As far as
14  Mr. Campbell, he is not on trial here. I think this would be
15  hearsay, too.
16              THE COURT: Approach the bench, please.
17       (THE FOLLOWING BENCH CONFERENCE WAS HELD OUTSIDE THE
18       HEARING OF THE JURY:)
19              THE COURT: Is it the government's contention that
20  Mr. Campbell is a member of this conspiracy?
21              MS. KRIGSTEN: Yes, sir.
22              THE COURT: Can you encapsulate for me his
23  participation? It is not that I am just testing you. I want
24  to be sure I am clear in my own mind.
25              MS. KRIGSTEN: This witness, the reason I am bringing

1   Q   Captain Gaston never told you that that is something
2   acceptable to do, right?
3   A   Definitely not.
4   Q   But nevertheless, other things you would -- you would use
5   excessive force on inmates before you got to the booking
6   department, right?
7   A   At times.
8   Q   And you wrote false reports about those, right?
9   A   Yes, sir.
10  Q   And you turned in those false reports to your shift
11  sergeant, right?
12  A   Yes, sir.
13  Q   You would get together with other officers to make these
14  false reports before you came to Captain Gaston's, under
15  Captain Gaston's supervision, right?
16  A   Yes, sir.
17  Q   And you all would come together and figure out what was
18  the best way to make out a false report to cover up your uses
19  of excessive force, right?
20  A   Yes, sir.
21  Q   You were familiar with -- you were familiar with --
22  weren't there certain groups of officers who worked the blocks
23  and in booking who were known for using excessive force?
24  A   Yes, sir.
25  Q   And as a matter of fact, if certain inmates were giving

1   problems, no matter where they were in the jail, those officers
2   could be called in to discipline them, right?
3   A   Yes, sir.
4   Q   And those officers were considered brothers with each
5   other, right?
6   A   To an extent, yes, sir.
7   Q   You were one of them?
8   A   Yes, sir.
9   Q   And that didn't make a difference whether or not they were
10  in booking or whether they worked the blocks. If something
11  needed to be taken care of, you were one of the people who
12  could be called on, right?
13  A   Yes, sir.
14  Q   You were one of the people who could be relied on to do a
15  false report, right, or no report at all? Is that correct?
16  A   That is correct.
17  Q   Regardless of whether you were under Captain Gaston's
18  supervision, Captain Taylor's supervision, Sergeant Collins'
19  supervision, you were one of those people, right?
20  A   Yes, sir.
21  Q   If someone needed their butts to get whooped, you were
22  someone they could call on, right?
23  A   Yes, sir.
24  Q   Did Sergeant Caldwell ever call you to go beat people up
25  at sallyport?

1  Q   How did you interpret that statement?
2  A   Basically, that they were going to do whatever it took to
3  handle business, to get a detainee that was quote-unquote out
4  of control, get them in control, and nothing would be written
5  on it.
6  Q   What do you mean by they would do whatever it took?
7  A   Whether it meant leaving them in the holding cell,
8  revoking a bond, using excessive force, tasing them, leaving
9  them handcuffed to the stools, the benches, inside the holding
10 cells.
11 Q   Was it your impression that booking ran by the same set of
12 rules as the rest of the jail?
13 A   No, sir, it was not.
14 Q   What gave you that impression?
15 A   Booking and Corrections was two totally different
16 departments, and as far as the way that it was ran, they took
17 control of the matters into their own hands, and a lot of times
18 they wouldn't involve the rest of the jail.
19 Q   When you say "they," who are you referring to?
20 A   The booking officers.
21 Q   Did you ever hear Gaston make any statements that
22 suggested that booking was separate from the jail?
23 A   Yes, sir.
24 Q   What sort of statements would he make?
25 A   I heard him on one occasion, well, several occasions, make

1  this question up is several questions have been asked about
2  other parts of the jail and their responsibility.  This witness
3  is going to testify that Mr. Campbell told these officers, told
4  this officer and other booking officers, y'all have to write a
5  report to give me something to work with.  I can't protect you
6  unless you give me a report and something to work with.

   **THE COURT:**  You may proceed.

   **MR. DAVIS:**  When did he tell this individual this?

   **MS. KRIGSTEN:**  I can ask him.

   **MR. DAVIS:**  Of course, Judge, if it is outside the time of the alleged conspiracy, I don't think it would be relevant either.

   **THE COURT:**  I am going to let you ask the question, I am going to let him answer, on the representations that you have made that he is a member of this conspiracy and that the declarations were made in furtherance of that conspiracy.

   (END OF BENCH CONFERENCE.)

**BY MS. KRIGSTEN:**

Q  Mr. Thompson, I was asking you about Steve Campbell.  Had you ever heard Mr. Campbell reference booking officers' reports?

A  As in what?

Q  That is not a very good question.  Let me try this again.  Did you ever hear Mr. Campbell talk about what should be in booking officers' reports?

1  A   Just, you know, if you would accidentally -- not
2  accidentally. If you would hit somebody in the head, just make
3  sure you can back it up by saying that you hit them in the
4  closest, the closest pressure point, the closest motor point
5  that we were trained to hit. With the Only Al-Khidir, however
6  you say his last name -- I'm sorry -- with that incident, it
7  was a brachial plexus strike. You know, instead of saying that
8  I landed the blow on the head, you know, I landed a blow on the
9  side of his neck or on top of the head.
10 Q   How did Defendant Gaston treat the people who worked in
11 booking?
12 A   He was like a father figure. He took very good care of
13 us. He was one of the people you could talk to about issues in
14 work, outside of work.
15 Q   Were you ever disciplined by Defendant Gaston?
16 A   No, ma'am.
17 Q   Were you ever reprimanded by Defendant Gaston?
18 A   No, ma'am.
19 Q   Did you ever use -- did you ever assault an inmate in
20 front of Defendant Gaston?
21 A   I almost did. I was in booking control, and a man pulled
22 out his penis and started banging it on the window and told me
23 to come and suck it. And as soon as I got out, I pulled the
24 cell door open and grabbed him and pulled him out of the cell,
25 and then Gaston had stopped me because I had lost my temper.

Case 1:06-cv-00912-LG-JMR   Document 242-6   Filed 04/13/09   Page 9 of 12

1219

1   any further into the jail.
2   Q   You remember giving special privileges to families for
3   people who couldn't bond out, like visiting people who couldn't
4   bond out?
5           **MS. KRIGSTEN:**  Objection, Your Honor, relevance.
6           **THE COURT:**  Objection is sustained.
7   BY MR. JUPITER:
8   Q   You talked a little bit about Steve Campbell in Internal
9   Affairs.  Captain Gaston was not part of the professional
10  standards unit or how most people would refer to it, the
11  Internal Affairs division?
12  A   No, sir, he was not.
13  Q   Who was responsible for disciplining officers?
14  A   Captain Steve Campbell.
15  Q   And what was, if you know, what was the role for anyone
16  who submitted -- what was the role of your supervisor with
17  regard to when something was referred to Internal Affairs?
18  A   Just cooperation.
19  Q   If you were not a witness, if something was in Internal
20  Affairs, isn't it true that you were supposed to leave that
21  matter alone to Internal Affairs?
22  A   Yes, sir.
23  Q   Now, you were interviewed with Preston Wills by Steve
24  Campbell, correct?
25  A   Yes, sir, I was.

1  Q   And after -- either before that interview or during that
2  interview, you came to the conclusion that Internal Affairs
3  would help, Steve Campbell particularly, would help you lie
4  about incidences?
5  A   Yes, sir, that is correct.
6  Q   Rick Gaston wasn't present at that meeting with you and
7  Preston Wills or Steve Campbell, correct?
8  A   No, sir, he was not.
9  Q   And Ryan Teel was always in Internal Affairs?
10 A   Yes, sir.
11 Q   Ryan Teel used to brag about the fact that he had a
12 permanent seat in Internal Affairs?
13 A   Yes, sir.
14 Q   Preston Wills used to brag about how Steve Campbell would
15 help him lie on -- when he was called down to Internal Affairs,
16 correct?
17 A   Yes, sir.
18 Q   Ryan Teel would brag about the fact that he had premade
19 reports down to a science, correct?
20 A   Yes, sir.  He said he would have it down to the point
21 where all he would have to do was fill in the name.
22 Q   Were you present when Wills admitted to choking an inmate
23 until he passed out in an Internal Affairs investigation?
24 A   I don't believe he ever admitted that, sir, not to
25 Internal Affairs.

1  Q   Who else explained it to you?
2  A   During that conversation, Teel, we were out back booking,
3  taking a break, and I had asked Regina about it because her and
4  Thompson were talking about it, and they began to explain to
5  me, and Teel came out there, and they were just kind of
6  talking -- it was talk among us back there.
7  Q   Was Defendant Gaston also present?
8  A   On one occasion when it was being mentioned, yes, he was.
9  Q   Did you hear Defendant Gaston talk about red light/green
10 light?
11 A   I heard him make the comment, "just remember, red
12 light/green light, don't leave any marks."
13 Q   Who did Defendant Gaston say "don't leave any marks" to?
14 A   There were several officers behind the booking cage, and
15 it was kind of to everybody. It was just kind of like a
16 general statement being made.
17 Q   How did you interpret Defendant Gaston's statement, "don't
18 leave any marks"?
19 A   That excessive use was going to be -- if it was going to
20 be used, excessive force, don't leave any marks, don't leave
21 anything that could be seen.
22 Q   What was Gaston's relationship with the other booking
23 officers like?
24 A   He was more like a buddy, just kind of a good ole boy. He
25 would come down there and talk to them. It wasn't like a

```
 1   supervisor relationship.  It was more of a buddy system with
 2   them.  He was on real good terms with them.  He had an open
 3   door policy with them.
 4   Q    Were you aware that there were video cameras in the
 5   booking area?
 6   A    Yes, sir.
 7   Q    Did the booking officers talk about those video cameras?
 8   A    Comments were made toward the cameras.
 9   Q    What sort of comments did the booking officers make?
10   A    At times other officers would remind them about the
11   cameras, or to go to the shower, to the shower room where there
12   weren't any cameras.
13   Q    Did you ever hear Defendant Gaston make comments about the
14   showers -- excuse me -- make comments about the video?
15   A    Yes.
16   Q    What sort of comments did Defendant Gaston make?
17   A    In regard to watching them, I had heard him say on several
18   occasions, don't worry about it, or if I am going to watch
19   them, it will be for a good laugh, for a joke.
20   Q    Did you ever hear Defendant Gaston talk about kicking ass
21   in booking?
22   A    Yes, sir.
23   Q    What would he say?
24   A    Comments were made like, we are going to kick ass and not
25   take any names.
```